Clifford W. MURPHY, Trustee, American Drilling Service Company Liquidating Trust, Plaintiff–Respondent,

v.

CITY OF SPRINGFIELD, Missouri, Defendant–Appellant.

No. 16080.

Missouri Court of Appeals, Southern District, Division Two.

July 31, 1990.

Robert H. Handley, Asst. City Atty., Springfield, for defendant-appellant.

Sharon F. Daily, Greensfelder, Hemker & Gale, St. Louis, for plaintiff-respondent.

SHRUM, Judge.

Defendant City of Springfield (City) appeals from a judgment, following jury trial, in favor of plaintiff for $88,950.40. The City presents six points alleging trial error. Twice, this case has been before this court. Detailed background facts are found in the earlier opinions.[1]

Plaintiff had no contract with the City but was a subcontractor who constructed 28 straight shaft foundation caissons for the City on which piers to support a viaduct were to be placed. Plaintiff claimed to have based its bid to general contractor Ted Wilkerson, Inc., on subsurface information shown on a boring log contained in the plans and specifications. The boring log was prepared from test boring logs earlier performed for the City at 13 of the 28 pier sites. The City claimed the test borings were done to determine how far

1. *American Drilling v. City of Springfield,* 614 S.W.2d 266 (Mo.App.1981); *Murphy v. City of Springfield,* 738 S.W.2d 521 (Mo.App.1987). The background facts in this case are essentially identical to the background facts in *Murphy v. City.*

down the bedrock was. A disclaimer as to the accuracy of the boring log information was placed on the plans.[2] Plaintiff presented evidence that, notwithstanding such language, it was customary in the industry for drilling contractors to rely on information on boring logs to determine the subsurface materials anticipated and, ultimately, the price they would quote for such information. The City offered evidence to the contrary and further offered evidence that they did not intend that a contractor should rely upon the borings (a) to determine what the subsurface materials might be or (b) in making their bids. The plaintiff's evidence was that subsurface conditions found during construction were different than what was represented in the boring logs and caused plaintiff to incur extra and unanticipated costs to complete the work in the sum of $88,950.40.[3] Plaintiff's case was based on the theory that the City had made a positive representation of a material fact (subsurface conditions as revealed on the boring logs) and that the information was false or incorrect; that plaintiff did not know when it submitted its bid that the information was false or incorrect; that it reasonably relied upon the positive representations made; and that it was damaged as a direct result of the representations. This court affirms.

■ The City's initial point claims prejudicial error in the definition of "positive representation" in Instruction No. 6 (verdict-director). The definition read:

A *positive representation* is a statement about conditions at the project site concerning which Defendant is presumed to speak with knowledge and authority. (Emphasis added.)

The City cites *Ideker, Inc. v. Missouri State Highway Com'n*, 654 S.W.2d 617, 624 n. 3 (Mo.App.1983), as support for its position that the definition was prejudicially wrong:

Collectively, [the cases] leave no escape from the conclusion that a bright line is drawn between "positive" or "affirmative" representations and representations of a lesser degree which are merely implied or suggestive. A "positive" or "affirmative" representation distinguishes an actionable representation from one which is merely implied or suggestive. Ergo, a "positive" representation of a material fact is a necessary element of such a cause of action.... The requirement that the representation be "positive" or "affirmative" goes to the very heart of whether a submissible case is made....

The City says the definition of "positive representation" in Instruction No. 6 made no distinction between actionable positive assurances by the City and bad-guesses by plaintiff; therefore, misled the jury as to what was "presumed." Plaintiff responds that the definition was correct and not error, citing as authority *Hollerbach v. United States*, 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898 (1914); and, alternatively, argues that if the definition of "positive representation" was error, it was not prejudicial.

Plaintiff's reliance on *Hollerbach, supra,* is misplaced. In *Hollerbach* the contractor brought suit to recover for the repair of a dam originally built by the government. The specifications for the repair job provided, "The dam is now backed for about 50 feet with broken stone, sawdust, and sediment to a height within 2 or 3 feet of the crest...." *Hollerbach*, 233 U.S. at 171, 34 S.Ct. at 555, 58 L.Ed. at 901. That repre-

2. "Subsurface information shown on this drawing was obtained solely for use in establishing design control for the project. The accuracy of this information is not guaranteed and it is not to be construed as part of the plans governing construction of the project. It is the bidder's responsibility to inquire of the engineer if additional information is available, to make arrangements to review same prior to bidding, and make his own determinations as to all subsurface conditions." Exhibit 2–A.

3. Plaintiff's evidence was that its unanticipated costs caused by positive representations of the City, which were not true, were as follows: $61,884.50 for extra rock excavation; $24,007.00 for extra costs for underground water pumping; $729.90 for casing left in place because of unanticipated conditions; $2,329.00 for excess concrete required because of unanticipated subsurface rock conditions. The jury verdict awarded plaintiff the full amount supported by plaintiff's evidence.

sentation was found to be untrue. There was an underlying cribwork of an average height of 4.3 feet consisting of sound logs filled with stones. Judgment for the government was reversed. The court observed:

> [T]he specifications assured them of the character of the material,—a matter concerning which the government *might be presumed* to speak with knowledge and authority. We think this positive statement of the specifications must be taken as true and binding upon the government, and that upon it, rather than upon the claimants, must fall the loss resulting from such mistaken representations.

*Hollerbach,* 233 U.S. at 172, 34 S.Ct. at 556, 58 L.Ed. at 901 (emphasis added). The statement in *Hollerbach* has to be read in context, i.e., the government built the dam; hence, they should know the materials and method of construction utilized. The language in *Hollerbach* was a fair comment on the evidence in that case. It is not correct as a definition of a "positive representation." If definition of the term "positive representation" was necessary, it was error to define the term on the basis of how the defendant acquired the information being represented, i.e., "a statement about conditions ... which defendant is ·presumed to speak with knowledge and authority." Whether a representation is "positive" or "affirmative" or is merely a representation of a lesser degree (merely implied or suggested), is not determined from how the representation is formulated. The public entity may have actual knowledge of the fact represented; the fact represented may be *presumed;* or the public entity may have no basis for its representation. The determinative issue is whether it is a positive representation. *Ideker, supra; Clark v. City of Humansville,* 348 S.W.2d 369, 374 (Mo.App.1961). Determining what is and what is not a "positive representation," will always be answered by the trier of fact case by case. *Murphy v. City of Springfield,* 738 S.W.2d at 527 n.

7; *Sanders Co. Plumbing v. City of Independence,* 694 S.W.2d 841, 847 (Mo.App. 1985).

 The trial court must define legal or technical terms, but it need not define non-technical, readily understood words or commonly used words. *McMullin v. Politte,* 780 S.W.2d 94, 96 (Mo.App.1989). The decision to submit a definitional instruction is a matter within the sound discretion of the trial court. *DeWitt v. American Family Mut. Ins. Co.,* 667 S.W.2d 700, 711 (Mo. banc 1984). When an instruction is not found in MAI (as is the case here), the test of that jury instruction is whether it "follows the substantive law and can be readily understood." *Massey–Ferguson Credit Corp. v. Black,* 764 S.W.2d 137, 144 (Mo. App.1989); *Southern Missouri Bank v. Fogle,* 738 S.W.2d 153, 157 (Mo.App.1987). In this case, the definition of "positive representation" included in the instruction given by the court was erroneous and did not follow the substantive law for the reasons outlined.

 It is necessary, however, to determine whether the erroneous definition in Instruction No. 6 prejudiced the defendant. Rule 70.02(c).[4] "It is not enough to show erroneous deviation unless prejudice also appears." *Hudson v. Carr,* 668 S.W.2d 68, 71 (Mo. banc 1984). The submitted instruction was not an approved MAI instruction and so no error is presumed and Rule 70.-02(b) need not be considered. *Cornell v. Texaco, Inc.,* 712 S.W.2d 680, 682 (Mo. banc 1986). In cases such as this, where a challenged instruction is not subject to the requirements of MAI, guidelines have evolved to resolve disputes over such instructions. *Wilson v. Bob Wood & Associates, Inc.,* 633 S.W.2d 738, 750 (Mo.App. 1981). Those guidelines include the rule that to reverse a jury verdict on the ground of instructional error, it must appear that the offending instruction misdirected, misled, or confused the jury; and, the burden to prove the proposition rests with the party challenging the instruction. *Cornell v.*

---

4. Rule references are to Missouri Rules of Civil Procedure (19th ed.1988), except where otherwise indicated.

*Texaco, Inc., supra,* at 682; *Wilson v. Bob Wood & Associates, Inc., supra,* at 750–51. The challenging party has been required to prove the instruction misdirected, misled or confused the jury where the alleged error is failure to define terms used in the verdict-director. *Essex v. Getty Oil Co.,* 661 S.W.2d 544, 558 (Mo.App.1983) (the term occurrence); *Fowler v. Park Corp.,* 673 S.W.2d 749, 754–56 (Mo. banc 1984) (the term negligence).

The City argues that by using the term "presumed" in the instruction, the term "positive representation" was defined "in a manner confusing to lawyers and jurors alike." That argument immediately raises the question of why counsel for the City did not request a correct instruction at the instruction conference. "If counsel [was faced] with an instruction containing a patent error, and is of the opinion that the instruction might make argument more difficult or have a substantial effect on the jury, it is perfectly possible to request a correct instruction at the instruction conference mandated by Rule 70.02(a)." *Fowler v. Park Corp., supra,* at 756–57. The only record at the instruction conference relative to objections by the City to Instruction No. 6 is the following:

> MR. HANDLEY: Your Honor, I'm not sure it is on the record or not, but I do want it to be shown that the defendant does object to each and every one of plaintiff's instructions as given.
>
> I've also noted that the verdict director presented by the plaintiff characterizes the status of American Drilling Service Company by designating them as a contractor when in fact they're a subcontractor on this job. I believe that would mislead the jury. It designates them with a status that they do not carry.
>
> THE COURT: Well, I'll leave that matter for final argument so that there won't be any confusion about it. I don't think there will be.

If Instruction No. 6 was misleading to *lawyers* and the jury, was the City "sandbagging" in not raising the point at the instructional conference? "Sandbagging" is the practice in which counsel remains silent at the instruction conference with the hope that his opponent will request an erroneous jury instruction. *Gilbert v. K.T.I., Inc.,* 765 S.W.2d 289, 295 (Mo.App.1988), citing *Fowler, supra,* at 756; *Points v. Dzur,* 713 S.W.2d 634 (Mo.App.1986); *Johnston v. Lerwick,* 738 S.W.2d 868 (Mo.App.1986). While it is true that Rule 70.03 clearly states that contemporaneous objections to instructions are not required to preserve claims of legal error, failure to raise the issue may be considered in determining whether an erroneous instruction is prejudicial. *Cornell v. Texaco, Inc., supra,* 682; *Fowler v. Park, supra,* at 757; *Hudson v. Carr, supra,* at 71–72.

The record in this case would not suggest that the City was "sandbagging." This is the third time this case has been to this court and that fact, coupled with the fact that the City did point out what it perceived to be misleading about the instruction, convinces this court that there was no "sandbagging." What does seem to follow is that the claimed prejudicial effect of the erroneous definition did not occur to the City until after the verdict. The concurring opinion of Judge Blackmar in *Cornell v. Texaco, Inc., supra,* at 683, is particularly apropos:

> We should strive for a procedural system which promotes fair trials and minimum opportunity for error. A reversal because of something which could have been corrected if it had been timely noted has no place in an enlightened procedural system. *I cannot believe that plaintiff's able counsel perceived an instructional problem which he considered disadvantageous to his client, but did not speak up.* He was trying the case to the jury, not to the court of appeals. *It is more reasonable to assume that he did not sense prejudice until he was casting around for error after being disappointed in the verdict.* (Emphasis added.)

It is hard to imagine that a jury would be misled or confused if the defect was not readily apparent to an alert counsel, who has lived with this case for many years,

and, who was obviously familiar with the concept of "positive representation."

The result of *Hudson v. Carr, supra,* and *Fowler v. Park Corp., supra,* has been to cast upon the appellate courts the obligation to evaluate the motives and intentions of counsel in utilizing and relying on the language of Rule 70.03.... [I]f counsel failed to detect the error its prejudicial impact must be minimal, and if counsel noted the error and remained silent he has waived any objection he may have to a correctly instructed jury.

*Points v. Dzur, supra,* at 635. A counsel's experience with a particular legal issue has been held to be highly significant in determining if prejudicial error resulted in the giving of an instruction. *See Points v. Dzur, supra,* at 635-36. As the City pointed out in closing arguments, "We fought this long and hard...." Mr. Handley was the attorney in *Murphy v. City of Springfield,* 738 S.W.2d 521, in which this court, more or less, pointed the way for a re-trial of the case. For the reasons herein stated, this court finds that the prejudicial impact of any error in Instruction No. 6 is minimal and does not require reversal.

Other considerations support this decision. It is proper to look to the closing arguments to determine if an instructional error was prejudicial. *Forinash v. Daugherty,* 697 S.W.2d 294, 308 (Mo.App.1985). Once, at the beginning of the closing argument, plaintiff's counsel referred to the definition of positive representation in Instruction No. 6:

The first issue is whether ... the City ... positively represented that underground rock and water conditions of a certain nature existed at the Benton Ave-nue Viaduct site. What is a positive representation? Well, the instruction gives you a definition for that positive representation. It's a statement about conditions at the site concerning which the City would be presumed to have or to speak with knowledge and authority.

In a case like this the City provided that statement, not in so many words, but in the form of the plans and specifications for the project.

At no other time, in a lengthy closing argument, was the definition referred to by plaintiff. The fact that plaintiff's counsel made no attempt to exploit the given definition in argument is significant in determining that the error was not prejudicial. *Fowler v. Park, supra,* at 755. Finally, there has been a trend away from reversal for error in instruction, unless there is a substantial indication of prejudice. *Fowler v. Park Corp., supra,* at 757; *Hudson v. Carr, supra; Looney v. Hindman,* 649 S.W.2d 207 (Mo. banc 1983). *See* Blackmar, Instructions and Reversals, 36 Mo.Bar J. 24 (1980); McCarter, MAI Error After *Fowler v. Park Corp.,* Revisited, 44 Mo.Bar J. 215 (1988). Considering the whole record (and mindful that retrials are burdensome, *Fowler, supra,* at 757, especially the third time), this court finds the error in Instruction No. 6 does not require reversal.

■ The City's second point is that plaintiff's suit should have been dismissed because the claim was barred by the City's sovereign immunity.[5] This court determined in *Murphy v. City of Springfield, supra,* at 525, that "[i]f plaintiff has a cause of action, it would be based on the

---

5. A brief review of the history of this case is here noted. The work by plaintiff giving rise to the suit was completed November 1977. Suit was initially filed December 1978. The City attacked all pleadings by various motions, the initial attacks being successful. *See American Drilling v. City of Springfield, supra,* at 268. Following the initial trip to this court, the City raised no claim of sovereign immunity. During the second appearance in this court, no claim of sovereign immunity was raised. Not until June 16, 1988, did the City attempt to plead sovereign immunity. Leave to amend was denied. The City then raised the issue in after-trial motions. There is precedent for disposing of this point by finding that this court's prior adjudication is not only the law of the case as to all questions directly raised and passed upon but it is also the law of the case as to matters which arose prior to earlier appeals and which might have been raised thereon but which were not raised or presented. *In re Marriage of Eden,* 621 S.W.2d 331, 332 (Mo.App.1981). However, we chose not to dispose of the issue on that ground.

theory stated in *Sanders*,[6] which we construe as the same theory set forth in *Clark v. City of Humansville.*" In *Clark v. City of Humansville*, 348 S.W.2d at 374, it was held that the "cause of action sounds in tort," and in the construction of a sewer system, "defendant, a city of the fourth class, has no tort immunity." *Id.* at 374–75. This was said to follow from the fact that in building a sewer, the City of Humansville was exercising a proprietary function. *Clark, supra,* at 375 n. 9. The decision in *Clark v. Humansville* predated the abrogation of sovereign immunity against tort liability in *Jones v. State Highway Commission*, 557 S.W.2d 225 (Mo. banc 1977). Accordingly, when the General Assembly reinstated sovereign immunity by § 537.600[7] (the statute which codifies sovereign immunity and specifies two exceptions)[8] it was a part of the common law of Missouri that sovereign immunity did not always bar a claim by a contractor against a city for positive representations, even when the claim is denominated as tort in character. *Clark v. City of Humansville, supra.* It is also true that before abrogation of sovereign immunity by *Jones v. State Highway Commission* and before it was reinstated by § 537.600, cities were not shielded from liability for their torts committed while fulfilling their duty to keep streets in a reasonably safe condition for travel.

In Missouri, as in most states, municipalities are not liable as a general rule for torts arising out of what is called governmental functions * * *. However, whether the construction, repair, and maintenance of streets be classified as a corporate or proprietary function, * * * or as a ministerial function, * * * or as governmental function for which there is an exception to the rule that a municipality is not liable for its torts, * * * under the law of this state "it is the primary and non-delegable duty of the city to exercise ordinary care to keep its streets in a reasonably safe condition for travel," * * * *and to this activity the doctrine of immunity from liability for torts does not apply.*

\* \* \* \* \* \*

[U]nder the well-established law of Missouri it is liable for its *torts* resulting from activities done in carrying out these duties *regardless of the name by which they may be called.*

*German v. Kansas City*, 512 S.W.2d 135, 142 (Mo. banc 1974) (emphasis added). *See also Myers v. City of Palmyra*, 355 S.W.2d 17, 18–19 (Mo.1962). The broadened view that a city is liable for its torts resulting from fulfillment of its duties regarding streets has been followed since the enactment of § 537.600 in 1978. *See Davis v. City of St. Louis*, 612 S.W.2d 812, 815 (Mo.App.1981).

The City cites *Sanders Co. Plumbing, supra,* and *Ideker, supra,* for the proposition that the common law of Missouri before 1977 applies sovereign immunity to bar the type of claim at issue in this case. Careful reading of those cases do not support that assertion. Sovereign immunity is discussed in each of those cases in only very general terms as being possible impetus for some courts calling this type claim a "cause of action ex contractu." *Sanders, supra, at 845; Ideker, supra,* at 621. Because *City of Humansville* was a part of the common law which existed before the 1977 statutory reinstatement of sovereign immunity, this court finds that sovereign immunity did not bar plaintiff's cause of action. Further, following *German v. Kansas City, Myers v. City of Palmyra,* and similar cases, plaintiff's claim is not barred by sovereign immunity because the claim arose during the City's attempts to keep its streets in a reasonably safe condi-

---

**6.** *Sanders Co. Plumbing v. City of Independence, supra,* 694 S.W.2d 841.

**7.** § 537.600 reads, in part: "Such sovereign or governmental tort immunity as existed at common law in this state prior to September 12, 1977, except to the extent waived, abrogated or modified by statutes in effect prior to that date, shall remain in full force and effect...."

**8.** Venker, Sovereign Immunity in Missouri: A Different Perspective on § 34.260, 42 Mo.Bar J. 81 (1986).

tion for travel. The City's second point is rejected.

■ In its third point, the City claims error in the trial court's refusal to give withdrawal Instruction C and not granting the judgment notwithstanding the verdict because: (a) of lack of evidence that the plaintiff relied in any manner on the information provided by the City regarding ground water; and (b) there was no substantive evidence to support the verdict that two-thirds of the water pumped was ground water.

To the extent that there were positive representations made by the City about ground water upon which plaintiff relied in making its estimates, Dale Holt was the employee who examined such representations.[9] Thirteen of the twenty-eight pier sites were test bored and the boring logs furnished plaintiff by the City revealed the following concerning ground water: No ground water was reported to be encountered at pier sites 11, 16, 19, 21, 22, 25 and 28. Ground water was reported to have existed at pier 1 (at 22′6″); pier 3 (at 15′6″); pier 5 (at 13′9″); pier 9 (at 17′0″); pier 13 (at 21′0″); and pier 17 (at 9′6″). The only other representations in the boring logs, which in any way relate to ground water, were comments about soil conditions; i.e., moist firm, moist med. firm, wet very soft, etc. Initially, Dale Holt testified in general terms to explain how, normally, the drilling of caisson holes would progress. During that testimony the necessity of pumping water was discussed as follows:

Q. ... Do you normally anticipate having to pump any water out of caissons?

A. There would be occasions when you might have to pump a little water out of the hole. There might be water that would seep in where the pipe itself ... didn't seal adequately, or there might be a little water that had gotten into the hole during the process of drilling it, yes.

Holt testified that the boring information is customarily included in the bidding documents for the common use of all contractors and that plaintiff relied upon the information given it by the City. In speaking specifically of the Benton Avenue contract, Holt said:

Q. Mr. Holt, did you utilize sheet number five [Ex. 2–A Boring Logs] for any purpose in the process of preparing American Drilling's estimate?

\* \* \* \* \* \*

A. Yes.

\* \* \* \* \* \*

Q. And did you use any other sheets of those ninety sheets in the process of preparing American Drilling's bid?

A. Number sixty-seven, Exhibit 2–B.... Those are obviously the principal ones.

\* \* \* \* \* \*

Q. As you were originally estimating this case you looked at sheet number five and I understand that you drew some conclusions with regard to ground water, correct?

A. That would have been one of our concerns, yes.

Holt said he was concerned with what water was below the ground, and that surface water or rainwater was something different from ground water:

Q. ... [W]hen you looked at those ground water notations is it correct that you only used those to draw conclusions with regard to how much ground water you would encounter?

A. ... I saw that it said there was ground water there, and so I knew that when I drilled that hole or I assumed—I won't say I knew, but I assumed that when I drilled that hole that I might encounter some water down below the ground that I'd have to pump out of the hole.

\* \* \* \* \* \*

9. Mr. Murphy testified he was not personally involved in the bidding phase of the Benton

Avenue project, Mr. Holt was responsible for that.

A. Now, where it would come from I can't tell you, but I mean this said that there would be some water there so I assumed that there would be some water there.

Q. ... [A]re you talking about ground water as opposed to surface water?

A. Ground water, below the surface.

Q. ... So that the conclusions you drew had nothing to do with any predictions as to rain that might occur on the site or surface water that might run into the holes?

A. Well, I'm not a weather forecaster so I didn't know what that would be.

Other evidence from Holt was that he presumed it might rain during construction; that water might run in the holes; and that he didn't use the ground water readings to make estimates as to rain during the term of the project or to estimate how much water might run in the hole if it did rain:

Q. ... When you formed your opinion as to how much ground water would be encountered at pier two between those holes, what did you look at to form that conclusion?

A. Again just the information that's on this drawing and a general summary of all of the test borings.

 \* \* \* \* \* \*

Q. ... [W]hen you include an amount of money in your estimate for cleaning and pumping do you estimate the quantities of water pumping in the same fashion that you estimate quantities of earth and rock? By that I mean yesterday you went through the calculation to determine cubic yards of earth and cubic yards of rock.... [D]o you use the same method to ... calculate the number of gallons of water that you're going to encounter at any particular pier?

A. No, we would not have done that. The removal of the water involves people lowering pumps in the holes and the pumps and the hoses and so on. And so you'd lower the pump in the hole and you let the pump run and pump the water out. So it's sort of [a] general appraisal of about how much time you would allow to perform that function. *It doesn't try to equate the volume of water that might come out of the hole.* (Emphasis added.)

Finally, the effect of rain on the cost estimates of water removal was discussed by Holt:

A. ... What I would always attempt to do on a project is, number one, equate what I had to do and then what that would cost, and then if there was an unknown, for instance how much rain or maybe there might be some things that you just don't—that you can't perceive, then you would put a markup or what we call a contingency on the thing to maybe absorb things that you just couldn't anticipate or you didn't know what it might amount to. That would maybe include rain and, you know, it might be a number of different things and I can't even enumerate what they might be now. So we'd put a contingency within our proposal to maybe absorb possibly that kind of possible occurrence.

Q. ... And then also in computing your $40.00 per pier for your line item for cleaning and pumping, would those sorts of considerations also go into your arriving at that $40.00 per pier figure?

 \* \* \* \* \* \*

A. I was trying to estimate as best I could what amount of time might be spent to remove the water from the holes and then on Exhibit Number 59 I think there's probably an item here for a contingency. Yes, there is. And within that I would have had to assume that, you know, there might be some rain days, there might be come [sic] conditions that we just can't outguess. I mean, you know, we're not magic. We don't know what's going to happen. So that would then be applied on top of what I estimated the cost to be.

The City argues that the above reveals a speculative guess on the part of Holt and not a misplaced reliance, especially when Holt didn't try to "equate [estimate] the volume of water that might come out of the hole." That argument attempts to divide the problems, i.e., the rock problem from the water problem, and treat them in an isolated fashion for purposes of legal analysis. However, there was evidence from which the jury could find that the plaintiff's problems with the rock and water were not separated, were not isolated one from another. Tom Boland, plaintiff's field superintendent, explained that a serious, unexpected problem was encountered when work was commenced. The problem was pinnacle rock, which he described as "rock that sticks up like fingers ... and doesn't cover the complete size of the caisson." Such rock formation affected the work in a number of ways. First, as the drilling tool attempted to cut the rock, it kept slipping to the side of the hole, or off center, and it made it very difficult to keep the caisson plumb. Secondly, encountering the pinnacle rock adversely affected plaintiff's ability to handle underground water. Tom Boland explained to the jury:

A. Well, normally with drilling under ground you expect a certain amount of water. The normal procedure is to drill the earth and then we take a piece of casing that has teeth on it and we screw that into the rock once we reach the rock and *that virtually seals the caisson.* And then we always have to pump out the water inside of the casing before we break up the rock and clean it out. *But with the pinnacle rock we could not seal the casing.*

Q. *... Why was that?*

A. *Because the rock wasn't over the entire bottom of the hole.* (Emphasis added.)

Accordingly, even though Holt did not rely on the plans to quantify the amount of water that would have to be pumped, there was evidence from which the jury could find that he relied upon the boring logs to determine that: (a) there was ground water (b) which he expected could, for the most part, be kept out of the caisson in the normal fashion by screwing the casing into the rock; (c) the rock was of such configuration as would permit this usual practice for keeping ground water out of the caisson by use of casing; and (d) hence, he relied upon the representations found in the boring logs in making his cost estimates for removal of water from inside the caisson once it was sealed off in rock by use of the casing.

The test is not whether American relied upon the subsurface information as it insists it did, but whether a reasonable person would rely on it in determining subsurface conditions to be encountered.

*Murphy v. City of Springfield, supra,* at 528.

There was evidence from which the jury could have found that a reasonable person would have relied upon the boring logs in determining what the subsurface conditions were (both rock and ground water). That evidence was elicited from Jene E. Hayes, a drilling contractor, who bid on the Benton Avenue project. His testimony was that the information on the boring logs supplied by the City was the sort of information contractors customarily relied upon, "[I]t's the only information that's available to us." Reliance by a contractor upon such boring information for the purpose of determining underground water conditions has been determined to be reasonable in *Sanders Co. Plumbing v. City of Independence, supra.* This court finds there was evidence from which the jury could have determined that plaintiff relied upon the boring logs in making the portion of its bid that related to underground water.

On the issue of the plaintiff's damages for dealing with the water, plaintiff offered evidence that the total costs were $36,011.22. Mr. Murphy testified plaintiff was not seeking the total costs, because "we had a basic obligation to pump what was known as and characterized as ground water." (When bidding, Holt estimated the cost of pumping underground water out of the caissons at $1,080.00, i.e., 27 piers at $40.00/pier). Murphy also acknowledged

that during the work heavy rains had occurred, flooding several of the caissons "brim full overnight" and "that was our risk during the course of the work." Included in plaintiff's bid was an additional $6,542.00 for "contingencies and risks" which Holt said was for "rain days" and conditions which "we just can't outguess."

With that background, Murphy said, "I took the responsibility for accepting one-third of the cost for our basic obligations.... We feel the City is obligated to pay $24,007.00 for the water conditions and our activities in coping with them." When asked if he had any personal knowledge as to how much of the water pumped was ground water and how much was rain water or surface water, Mr. Murphy's response was "[I]t would be impossible to even contemplate, let alone calculate in one's mind." Mr. Murphy further testified:

Q. ... And are there any business records of the American Drilling Service Company that you could refer to that would be able to calculate what percentage of all of this water was water that ran in say during floods or rains and how much of it was ground water?

A. No, sir. That's the basic reason that we accepted a full $12,000.00 ... of the costs.

Q. So, what you're saying is that you don't have any information on which to form a belief whether most of the water that came out was ground water or most of the water that you had to pump out was surface water? I'm asking if you have any information on which to base that?

A. No sir, I could not give you a factual response to that request.

Mr. Murphy did testify "I know that $12,-000.00 is more than adequate to cover the cost of removing the rain water." When asked what that was based upon, he replied: "[A]lmost fifty years of experience in the construction industry and more than forty-two years' experience in the drilling caisson industry."

From the above, the City contends that there is no basis for determining with reasonable certainty what plaintiff's damages were. This court disagrees. The record demonstrates that Mr. Murphy, 69 years old at trial, had started his own drilling business in 1955 and had substantial experience in the foundation drilling business. His opinion that the $12,000.00 reduction from total costs was more than adequate to cover the costs of removing the rain water was not objected to by the City. The evidence from Murphy that $12,000.00 was more than adequate to cover the costs of removal of rain water was not contradicted by any evidence offered by the City. It is significant that the City offered no method by which damages could be more accurately measured for the additional costs incurred for ground water removal caused by unforseen subsurface conditions than that offered by Mr. Murphy. *Ideker, supra,* at 627. The rule is set forth in *City of Kennett v. Katz Const. Co.,* 273 Mo. 279, 292–93, 202 S.W. 558, 562 (1918), as follows:

[L]et it be said ..., in applying the rule against the recovery of uncertain damages, it is the uncertainty as to their nature, and not as to their measure or extent, that is meant. While the actual amount of damages from the breach of a contract may not be susceptible of proof, the law does not permit one whose act has resulted in loss to another to escape liability on this account. The manner of measuring the damages having been ascertained, impossibilities in proving same are not required, but *only that the best evidence be adduced of which the nature of the case is capable;* in other words, the degree of certainty of the proof is dependent upon the character of the proceeding. (Emphasis added.)

That rule was cited and followed in *Ideker, supra*; in *Denton Const. Co. v. Missouri State Highway Com'n,* 454 S.W.2d 44, 56 (Mo.1970), and it is appropriate that it be applied here. Also, *see Coach House of Ward Parkway v. Ward Parkway Shops,* 471 S.W.2d 464, 471–72 (Mo.1971). Following that rule is in keeping with the apparent motivation of the courts in developing this cause of action; namely, concepts of

fundamental fairness. *Ideker, supra,* at 621.[10] The City's third point is denied.

■ The City's fourth point claims error by the trial court in not withdrawing from the jury's consideration the concrete overrun claim. The City argues that the only evidence received in support of the claim was hearsay testimony which was timely objected to. This point is ruled against the City. Concrete was used to fill the voids and fissures in the limestone as they were encountered during the course of the caisson installation in order to make a good quality foundation caisson. The general contractor Wilkerson paid for the concrete. Furnishing caisson concrete was part of plaintiff's responsibility under its subcontract with Wilkerson. Plaintiff gave credit to Wilkerson for the caisson concrete purchased by Wilkerson. Mr. Murphy testified, "It was deducted from our check." Murphy was asked about the total number of yards of concrete placed on the project.

At that point the City conducted a voir dire of Mr. Murphy, asking if he had personal knowledge as to how much excess concrete went into the holes. He responded that he only had the records from Wilkerson because that company had ordered, acknowledged receipt for, and paid for the concrete. The City objected to further testimony about the quantity of concrete on the basis that they were the business records of Wilkerson; hence, hearsay. The trial court overruled the objection. Murphy then testified as to the total yards of caisson concrete used, what had been anticipated based upon the representations of the City, and the cost, and asked the jury to award plaintiff $2,259,00. From the verdict of the jury it is apparent that $2,259.00 for extra caisson concrete was included in

the jury's verdict.[11] The City contends that Wilkerson's records were not "proven up," were hearsay, and by reason thereof, there was no evidence justifying submission to the jury of the claim for extra concrete. Such argument ignores the fact that Wilkerson's records were not offered and received in evidence. Further, Mr. Murphy's testimony was grounded on the amount of money that had been deducted from plaintiff's check. Plaintiff's losses, the amount deducted from its check for the extra caisson concrete, was the subject matter of his testimony. There was no error in the court's overruling of the City's objection; accordingly, there was evidence (per Murphy's testimony) to support submission of the matter to the jury and to support the jury verdict. This point is ruled against the City.

■ By its fifth point, the City claims error in the trial court's refusal to give a requested affirmative converse instruction conversing plaintiff's verdict-director.[12] The City seized upon language in *Murphy v. City of Springfield, supra,* at 528: *"Whether the boring information was intended to be used only for determining the length of the caisson shafts or the City was aware and* intended that *a general or subcontractor* would use it to determine *cubic* quantities is a question for the trier of fact," as authority for the proposition there was error in not giving Instruction E. Summarized, the City argues that whether it *"was aware and* intended that *subcontractors* would use the information to determine *cubic* quantities, was one of the main issues this Court remanded for jury determination, and the jury instruction which was given (Instruction No. 6),

---

**10.** *Ideker, Inc., supra,* at 620, properly notes that this particular cause of action occupies "a rather narrow niche in the vast body of case law." "If performance thereof by the contractor entails more expense than was calculated in submitting its bid, the governmental entity should bear the added cost rather than the contractor because the former is the beneficiary of necessary but unbargained for work resulting from its positive representation of a material fact which turned out to be false or incorrect." *Id.* at 621.

**11.** See footnote 3.

**12.** "Instruction No. E

Your verdict must be for defendant on Plaintiff's rock excavation claim if you believe the boring information was intended by the defendant to be used only for determining the length of caisson shafts and if you believe the defendant was not aware and did not intend that a general or subcontractor would use it to determine cubic quantities."

managed to avoid submitting every one of those elements."

"If you believe" brands Instruction E as an affirmative converse. *Powers v. Ellfeldt*, 768 S.W.2d 142, 145 (Mo.App.1989); MAI 33.05(1) [1988 New]. "The function of the affirmative converse is to permit the defendant to submit his theory of the case without being required to directly negative the plaintiff's theory." *Powers v. Ellfeldt, supra*, at 145. *See Williams v. Christian*, 520 S.W.2d 139, 145 (Mo.App.1974). The Notes on Use for MAI 33.05(1) [1988 New] state that "[t]he affirmative converse instruction should not be used to submit in the affirmative the same issue as has already been submitted in the verdict directing instruction."

This court finds that Instruction E violated the rule that an affirmative converse may not be employed to converse a proposition made in the plaintiff's verdict-directing instruction. *Stover v. Patrick*, 459 S.W.2d 393, 396 (Mo. banc 1970); *Oliver v. Bi–State Development Agency*, 494 S.W.2d 49 (Mo.1973); *Powers, supra*, at 145. In *Murphy v. City of Springfield, supra*, at 528, this court held, "[T]hat the jury should determine if defendant intended for the boring information to be relied upon in the manner it was." That issue of intent was submitted to the jury in paragraph first of the verdict-director.[13] The issue of intent could properly have been conversed only by a true converse instruction. *Weir v. Wilmes*, 688 S.W.2d 53, 55 (Mo.App.1985). Because the defendant's affirmative converse instruction, if given, would have submitted the very same issue as submitted in the verdict-directing instruction, albeit in different language, and did not submit an additional issue, it would have been error for the trial court to have given Instruction E. *Stover v. Patrick, supra*, at 396; *Weir v. Wilmes, supra*, at 55. The City's fifth point is without merit.

▮ In its final point, the City alleges error by the trial court in not giving Instruction F.[14] The instruction is an affirmative converse regarding what the City alleges is plaintiff's duty to exercise ordinary care in relying on and using information from the boring logs. The City says that the alleged failure of plaintiff to use ordinary care was an "affirmative defense, pleaded and supported by the evidence...." However, perusal of the City's answer reveals the City never pleaded affirmatively that plaintiff had failed to use "ordinary care" in the use of the logs, but rather alleged it "was not reasonable for American to rely on the Boring Logs...."[15] Plaintiff did have the burden to prove that it was reasonable for it to rely upon the boring logs. *Murphy v. City of Springfield*, at 528. Instruction No. 6 correctly required the jury to so find before entering a verdict for plaintiff.[16]

13. "INSTRUCTION NO. 6
Your verdict must be for Plaintiff if you believe:
First, Defendant positively represented that certain underground rock and water conditions existed at then Avenue viaduct site, intending that a drilling contractor such as American Drilling Service Company ('American') would rely upon such representations for determining quantities of work and materials such as earth and rock excavation, water pumping, casing and concrete that would be necessary to construct the foundation caissons...."

14. "INSTRUCTION NO. F
Your verdict must be for defendant on Plaintiff's rock and water claims if you believe the plaintiff failed to exercise ordinary care when plintiff [sic] relied on the boring information to determine cubic quantities of earth and rock and quantities of water."

15. Paragraph 18 of the City's answer to plaintiff's fourth amended petition reads: "Denies each and every allegation contained in Paragraph 18 of Count I; Defendant further states that the City made no positive or affirmative representations, warranties or promises to American as to subsurface conditions; Defendant further states that *it was not reasonable for American to rely* on the Boring Logs and other provisions contained in the Bid Plans and Specifications for determining quantities of rock that would be excavated from Caisson shafts." (Emphasis added.)

16. "INSTRUCTION NO. 6
. . . . .
Third, American *reasonably relied* upon the representations in preparing American's bid...." (Emphasis added.)

■ If indeed failure to "exercise ordinary care" was an affirmative defense to plaintiff's cause of action (an issue which this court does not decide), it was not pled in the City's answer. Rule 55.08 requires a party to set "forth affirmatively ... contributory negligence ... and any other matter constituting an avoidance or affirmative defense." If the City intended to raise a defense that plaintiff failed to "exercise ordinary care" in relying on the logs in the belief that such defense was different and independent of plaintiff's burden of proving that it "reasonably relied" on the logs, then such defense has to be pled. *Shaw v. Burlington Northern, Inc.*, 617 S.W.2d 455, 457 (Mo.App.1981); *Layman v. Southwestern Bell Tel. Co.*, 554 S.W.2d 477, 480 (Mo.App.1977).

A defense, which contends that even if the petition is true plaintiff cannot receive the relief sought because there are additional facts which place defendant in a position to avoid responsibility, must be set forth in defendant's answer.

*Shaw v. Burlington, supra*, at 457. The evidence offered by plaintiff to meet its burden of proving reasonable reliance did not create any unpleaded issues at trial. When evidence is relevant to an issue already in the case and there is no indication that the party who introduced it was seeking to raise a new issue, pleadings are not amended by implication or consent under Rule 55.33(b). *Shaw v. Burlington Northern, supra*, 457; *Gee v. Gee*, 605 S.W.2d 815, 817 (Mo.App.1980). Here, evidence offered by plaintiff on the issue of "reasonable reliance"[17] did not raise a new issue not pleaded.

17. "INSTRUCTION NO. 6

. . . . .

The Test for 'reasonable' reliance on the City's subsurface information is whether a person in Plaintiff's situation would rely on that information in determining subsurface rock and water conditions to be encountered."

18. MAI 23.05:
"Your verdict must be for plaintiff if you believe:

. . . . .

Fifth, plaintiff relied on the representation in making the purchase, and [*in so relying plain-*

The requirement that plaintiff had to exercise "ordinary care" was substantially submitted by Instruction No. 6. When the right to rely is in issue in a fraudulent misrepresentation case, MAI 23.05 requires the jury to decide if plaintiff used ordinary care in relying on defendant's representation.[18] The MAI 11.09 [1981 New] definition of "ordinary care" when used with MAI 23.05 is "that degree of care that would be reasonable in plaintiff's situation." Here, Instruction No. 6 required that the City's representations be material[19] and that plaintiff reasonably relied.[20] Material was defined in Instruction No. 6 as "a representation to which a *reasonable person* might attach importance in choosing his course of action. In other words, it is a representation that could reasonably be expected to influence the conduct of a person with respect to the transaction in question." That definition was in keeping with this court's opinion in *Murphy v. City of Springfield, supra*, at 527. Instruction No. 6 told the jury that "[t]he test for 'reasonable' reliance ... is whether a person in plaintiff's situation would rely on that information in determining subsurface rock and water conditions to be encountered." This definition also followed *Murphy v. City of Springfield, supra*, at 528. The definition is in keeping with the MAI 11.09 definition of ordinary care.

Accordingly, the proper form of converse instruction for the City to have offered would have been a true converse, not an affirmative converse, such as Instruction F. Instruction F would have improperly submitted the same issue already submitted in the verdict-director, albeit in different language. *Weir v. Wilmes, supra*,

*tiff was using ordinary care, ...]...."* (Emphasis added.)

19. "INSTRUCTION NO. 6

. . . . .

Second, the representations were material to American in preparing American's bid; and...."

20. See footnote 15.

at 55. Accordingly, the trial court did not err in refusing to give Instruction F.[21] The judgment is affirmed.

HOGAN, C.J., and FLANIGAN, P.J., concur.

---

**21.** Instruction F did not contain a definition of "ordinary care." When the phrase "ordinary care" is used in an instruction, it must ordinarily be defined. MAI 11.09 [1981 New] definition of "ordinary care" must be used with MAI 23.05. Failure to define ordinary care in Instruction F would also have been improper.