COTNER PRODUCTIONS, INC., and Steve Litman Productions, Inc., Plaintiffs–Respondents,

v.

Gary W. SNADON and Patsy Snadon, Husband and Wife, Defendants– Appellants.

No. 22124.

Missouri Court of Appeals, Southern District, Division One.

March 8, 1999.

Motion for Rehearing and Transfer Denied March 30, 1998.

Application to Transfer Denied June 1, 1999.

Vincent F. O'Flaherty and Melodie A. Powell, Niewald, Waldeck & Brown, Kansas City, Gary A. Love, Ozark, for Appellants.

Joseph D. Sheppard, III and Rodney H. Nichols, of Carnahan, Evans, Cantwell & Brown, of Springfield, MO, for Respondents.

JAMES K. PREWITT, Presiding Judge.

Plaintiffs filed this action in "quantum meruit," seeking damages for the reasonable value of their services to Defendants in connection with arranging for Wayne Newton to perform as an entertainer at a theater developed by Defendants. Following jury trial, Plaintiff Cotner Productions, Inc. received a verdict in its favor and against Defendants for $150,000.00, plus interest, and Plaintiff Steve Litman Productions, Inc. received a verdict in its favor for $200,000.00, plus interest. Judgment was entered in accordance with the verdict. Defendants appeal, presenting six points relied on. As an aid to understanding the points relied on, we initially recite some of the facts presented at trial.

## GENERAL FACTS

Howard Cotner is the principal owner and operator of Cotner Productions, Inc., and Steve Litman is the principal owner and operator of Steve Litman Productions, Inc. Both men are entertainment promoters; Cotner is from the Springfield area, and Litman is from St. Louis. They work together on occasion in the promotion and booking of various entertainers for live performances and appearances.

Defendants Gary Snadon and Patsy Snadon are Branson, Missouri residents and have participated in the development and operation of various tourist and entertainment attractions in the Branson area. In 1990, Gary Snadon and Patsy Snadon acquired an interest in the Ray Stevens Theater in Branson. Late in 1991, they were seeking to sell their interest in the theater. Gary Snadon discussed the possibility of such a sale with Charles Luna, a long-time acquaintance, from the Branson area. In the course of these discussions, Gary Snadon provided to Charles Luna a financial report on the Ray Stevens Theater, which Charles shared with his brother, Larry. Both were impressed with the profitability of the theater.

Larry Luna was a friend of Howard Cotner. In anticipation of their participation in the Ray Stevens Theater operation, Luna approached Cotner regarding the possibility of his managing the theater. Their initial discussions involved the prospect of adding additional entertainers to perform at times when Ray Stevens was not appearing. Wayne Newton was suggested as a possibility, since Howard Cotner had previously produced shows which Newton headlined.

The Snadons ultimately sold their interest in the theater to Ray Stevens, but Charles and Larry Luna remained interested in operating a theater in Branson. Charles approached Gary Snadon with the idea they operate a theater with Wayne Newton as the entertainer. Gary Snadon expressed an interest in the project, but only if Wayne Newton was the performer involved.

On February 18, 1992, Gary Snadon, Charles Luna and Larry Luna participated in a meeting with Howard Cotner and

Jeannie Cotner, at the Cotners' home. Also present was Steve Litman. Larry Luna had been in contact with Cotner previously, and Cotner testified that although he knew of Gary Snadon and his background in Branson, he had never met him and wished to do so if he was going to be presenting the Snadons to Wayne Newton. They discussed the prospect of recruiting Wayne Newton to perform in Branson.

The result of the meeting was that Howard Cotner and Litman were directed to contact Wayne Newton and arrange for a meeting with him to discuss the theater project, and Gary Snadon indicated he would check into the possibility of acquiring additional land upon which to build a theater. Cotner and Litman arranged for a meeting with Wayne Newton in March.

On March 6, 1992, Steve Litman and Howard Cotner met with Wayne Newton at Hot Springs, Arkansas. They had coproduced Newton's appearance there. They discussed with Newton his headlining a theater in Branson. Newton inquired into the competency and capacity of the Snadons and Lunas to successfully handle such a project. He testified that without the positive assurances and recommendations from Cotner and Litman regarding Snadon and Luna he would not have agreed to any further discussion. Cotner and Litman furnished him with information regarding the Branson area and the potential market for his performances there. Newton was interested in knowing if the Snadons had the ability to manage the project. Newton expressed his interest in participating in the project and agreed to a subsequent meeting with the parties in Las Vegas, Nevada, later that month. After the initial meeting with Cotner and Litman, Newton directed his accountant, Marty Weiss, to investigate the prospect of such a Branson engagement. Mr. Weiss subsequently met with Steve Litman in an effort to obtain further information regarding the Branson market. Cotner and Litman arranged with Newton for a meeting between the interested parties on March 22, 1992, in Las Vegas.

On that date, prior to the scheduled meeting with Wayne Newton, Gary Snadon and Patsy Snadon, Charles Luna and his wife, Larry Luna and a friend, and Howard Cotner and Steve Litman gathered in the Snadons' room and discussed various matters relating to the pending meeting with Newton. Mr. Snadon provided architectural renderings of a theater for their inspection, and Steve Litman provided the group with financial projections which he had compiled. The projections contained several scenarios, based upon various attendance estimates and performance schedules. They also purportedly discussed, although there is a disparity in the testimony regarding how seriously or into what depth these items were discussed, estimates for management fees ($10,000/month), booking commissions (5%), and management fee overrides (20%), which were intended for the compensation of Cotner and Litman. Following the discussion of these items, the meeting adjourned.

The meeting with Wayne Newton was held later that evening in his dressing room following his performance, which the parties had attended. Also present were his accountant and his fiancé. The group made their presentation to Mr. Newton, who indicated to them he was interested in pursuing such a project, and all agreed that Newton should come to Branson so that he could check it out for himself. Following the meeting in Newton's dressing room, the group from Missouri reconvened in the coffee shop at the hotel and discussed the meeting.

On March 26, 1992, Gary Snadon contracted for the purchase of an additional 32 acres to accommodate the construction of a theater. In April of 1992, the Snadons held a meeting in Branson, where they proposed certain changes regarding the compensation of Cotner and Litman. Present at this meeting were the Snadons, Charlie and Larry Luna, Steve Litman,

and Howard Cotner and Jeannie Cotner. There, the Snadons told Mr. Litman that unless he invested in the project and moved to Branson to participate in the management of the theater, he would no longer be part of the project. The Cotners were offered the same management opportunity. Neither accepted the offer at that time. Mr. Litman testified he could not move to Branson, and ultimately was no longer party to the theater project. The Cotners did accept employment as managers. There was conflict in the testimony regarding the salary, but apparently it was ultimately determined that the Cotners would accept $100,000 for their management of the theater.

On June 4, 1992, the Snadons incorporated Shenandoah South, Inc., a corporation that ran the theater. Wayne Newton signed his performance contract with Shenandoah South, Inc. on August 1, 1992. Construction began on the theater in September of 1992. Named the Wayne Newton Theater, it opened May 1, 1993. The Lunas sold their interest in August of 1993.

Contradictions in the testimony included:

Gary Snadon testified that Charles Luna initially represented the Cotners as "potential investors," and that he believed it was in that capacity they were involved up until the trip to Las Vegas. Snadon testified that at the meeting in his hotel room on March 22, 1992, there was no indication from him that he was willing to pay Plaintiffs the amount of compensation that was listed on the projections they reviewed. He had only offered to allow them to invest.

Larry Luna testified that fee arrangements were discussed at the meeting in Snadons' room on March 22, 1992, and were brought up by Mr. Snadon. Mr. Luna also remembered that the same fee arrangements were discussed in the meeting at the Cotners' home in February, 1992, and there was no condition requiring investment and no objections to compensate Litman and Cotner prior to the meeting with Wayne Newton in Las Vegas. He further testified: "I believe there was an implied agreement to compensate [Plaintiffs] for introducing them to Wayne Newton and bringing him to Branson.... " " It was not a gratuitous meeting or effort by [Plaintiffs] from that point on."

Charles Luna testified that when Plaintiffs stated "they wanted 25 percent of the business," he responded, "[T]he only way you're going to get to own any of this theater ... is that you put up a proportionate amount of the capital." Further: "When he wanted 25 percent given to him for what he had done to that point, I thought it was ridiculous. Now, that was my opinion of his proposal. As a businessman there wasn't any way in the world he was going to get 25 percent of the action for nothing,—for a couple of phone calls...."

Steve Litman and Howard Cotner both testified that had they received any opposition to their compensation for the arrangements made with Wayne Newton; they would have canceled the meeting with Newton in Las Vegas. Wayne Newton testified that during a meeting he had with the Lunas, Snadons, and Cotners in Branson (after their initial meeting in Las Vegas): "Mr. Snadon said that he felt very uncomfortable about paying Mr. Litman a finder's fee for having put us together." A similar issue came up regarding the Cotners two or three weeks later and Newton testified he told them he "couldn't be a party to anything that would cut them out of what [he] felt they rightly deserved for putting [them] all together." Other facts will be mentioned in discussing Appellants' points.

**SUFFICIENCY OF THE EVIDENCE**

Although it is Defendants' sixth and last point, it is discussed first as it challenges the sufficiency of the evidence to support the verdicts. Defendants contend "that the evidence shows there was

no acceptance of services by them and further shows no reasonable value for any services which may have been provided."

▮▮▮ This Court reverses a jury verdict for insufficient evidence only where there is an absence of probative facts to support the jury's conclusions. *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 461 (Mo.banc 1998). The jury judges the weight of the evidence and credibility of the witnesses and where reasonable minds can differ on factual questions, this Court does not disturb the jury's verdict. *Brewer v. Devore*, 960 S.W.2d 519, 521 (Mo.App. 1998). This Court considers the evidence in the light most favorable to the prevailing party. *Robinson v. Empiregas, Inc. of Hartville*, 906 S.W.2d 829, 832 (Mo.App. 1995).

▮▮▮ Quantum meruit is a remedy to enforce quasi-contractual obligations and is generally justified on the theory of unjust enrichment. *Matter of Estate of Wilde*, 963 S.W.2d 336, 338 (Mo.App.1997). Quantum meruit is based on a promise implied by law that a person will pay reasonable compensation for valuable services or materials provided at his request or with his approval. *Kickham v. Gardocki*, 966 S.W.2d 361, 363 (Mo.App.1998).

▮▮▮ Where a person renders valuable service to another, the parties being strangers, and such service is accepted, the law will presume an implied promise to pay. *Abresch v. Schultz*, 216 S.W.2d 134, 139 (Mo.App.1948). "Strangers" being the absence of a family relationship or a relationship which would lead one to believe that the service would be performed gratuitously. *Id.* Where a prima facie case is made by plaintiff in quantum meruit, and defendant presents evidence tending to show the parties intended there was to be

no compensation, an issue of fact is presented to the jury. *Id.*

▮▮▮ "To recover in quantum meruit, a plaintiff must plead and prove that it provided to defendant materials or services at the request or with the acquiescence of defendant, that those materials or services had a reasonable value, and that defendant, despite demands of plaintiff, has failed and refused to pay the reasonable value of those materials and labor." *Berra v. Bieg Plumbing Co., Inc.*, 584 S.W.2d 116, 118 (Mo.App.1979).[1]

Viewing the evidence in the light most favorable to plaintiffs, there appears little doubt but that Defendants accepted the services. Plaintiffs arranged for the meetings with Wayne Newton which resulted in a contract being entered into by him with the corporation formed by Defendants. The services were rendered before the corporation was formed. It seems obvious to us that by attending the meeting with Newton and discussing his proposed performances in Branson, that Defendants accepted the services performed by Plaintiffs.

We likewise find there was evidence of the reasonable value of the services. There was evidence that the Snadons agreed to a percentage fee, and an expert witness testified that a fee for these services would be twenty to twenty-five percent of what the entertainer, in this case Newton, was to make. Point VI is denied.

## PACKAGING OF INSTRUCTIONS

▮▮▮ We discuss Defendants' remaining points in the order presented. For their first point, Defendants contend that the trial court erred in packaging the instructions "because the case was not a complex case requiring the instructions to be packaged in that Cotner and Litman submitted

---

1. MAI 26.05 is the pattern instruction submitting quantum meruit. It states:
 Your verdict must be for plaintiff if you believe:
 First, plaintiff furnished (*here describe generally the goods or services* )

to defendant, and
 Second, defendant accepted such [goods] [services].

one claim for a single finder's fee which did not depend on differing theories of recovery or differing evidence as to liability or damages."

 Packaging of instructions is designed to simplify the submission of complex cases. *Joiner v. Auto–Owners Mut. Ins. Co.*, 891 S.W.2d 479, 485 (Mo. App.1994). Under this concept, all instructions needed to resolve a particular claim are to be packaged together. *Id.* Any case having more than one verdict form is a complex case. *Id.*; MAI 2.00(b) [1996].

 Packaging is within the discretion of the trial court. *Joiner*, 891 S.W.2d at 485. Whether or not there should have been more than one verdict form is not a contention made in this point. There was more than one, and thus there was no abuse of discretion. It appears that packaging was required under MAI.

When the separate verdict-directing instructions were offered, Defendants objected and offered two proposed verdict directors; one for Plaintiff Cotner Productions, Inc., and a separate one for Plaintiff Steve Litman Productions, Inc. Those instructions were refused and the court gave the instructions tendered by each Plaintiff. Whether the court gave the verdict-directing instructions tendered by Plaintiffs or those tendered by Defendants, separate verdict forms and packaging would have been required. Point I is denied.

### PLAINTIFFS' VERDICT— DIRECTING INSTRUCTIONS

 For their second point, Defendants assert that the trial court erred in giving verdict-directing instructions for each Plaintiff because they were "vague, confusing and misleading in that the words 'by bringing together and introducing Wayne Newton to defendants' did not adequately describe any services provided by Cotner and Litman and could be interpreted in more than one way." MAI 26.05 [1996], the pattern instruction for quantum

meruit, was set forth as note 1 in our discussion in determining if a submissible case was made. The instructions here questioned are identical except for the names of the Plaintiffs, therefore we only set forth the verdict-directing instruction tendered by Plaintiff Cotner Productions, Inc. and given by the court:

> Your verdict must be for Plaintiff, Cotner Productions Inc., if you believe:
>
> First, Plaintiff Cotner Productions, Inc. furnished services, by bringing together and introducing Wayne Newton, to Defendants, and
>
> Second, Defendants accepted such services.

 An appellate court does not reverse for instructional error unless prejudice is shown. *Haberstick v. Gordon A. Gundaker Real Estate Co., Inc.*, 921 S.W.2d 104, 109–10 (Mo.App.1996). The prejudicial effect of erroneous instruction must be judicially determined under Rule 70.02(c). *Keifer v. St. Jude's Children's Research Hospital*, 654 S.W.2d 236, 238 (Mo.App.1983). To reverse on grounds of instructional error, the offending instruction must have misdirected, misled, or confused the jury, and the burden to show this rests on the party challenging the instruction. *Murphy v. City of Springfield*, 794 S.W.2d 275, 278–79 (Mo.App. 1990). An instruction should be brief and not submit to the jury or require detailed findings of evidentiary facts. *Drury v. Missouri Pac. R.R. Co.*, 905 S.W.2d 138, 146 (Mo.App.1995).

Assuming, but not deciding, that these instructions were, as Defendants assert, vague, we do not find them confusing or misleading, and thus prejudicial, under the facts before us. There was no real dispute over any significant actions that occurred in the arrangements made to introduce Defendants to Wayne Newton and persuade him to consider and ultimately enter into an agreement to perform at the theater which Defendants caused to be con-

structed. In contending that the evidence was insufficient, as discussed previously, Defendants alleged that there was no acceptance of the services by them and no reasonable value shown for those services. Those appear to have been the principal issues in dispute. That Plaintiffs provided services and what services they provided was not a factual matter in which there was any real dispute. Under these circumstances, we cannot say that these instructions were prejudicial. Point II is denied.

## INTRODUCTION OF FINANCIAL EXHIBITS

■ For their third point, Defendants assert that the trial court erred in admitting Exhibits 3, 42, and 43, because the exhibits "were self-serving and speculative in determining the reasonable value of any services Plaintiffs provided...."

Exhibit 3 was a document entitled "Ray Stevens Theater Financial Report." Plaintiffs offered it during the direct testimony of Larry Luna. At that time, Defendants objected that it "lacks foundation and this witness lacks firsthand knowledge of the figures contained therein," and that it was "hearsay."

Exhibit 42 was entitled "Preliminary Concept Wayne Newton Theater, Branson, Missouri." The exhibit was dated February 12, 1992, and on its cover indicated it was prepared by Plaintiffs. It was objected to as being irrelevant and "a bunch of numbers which is simply speculation." There was evidence that the exhibit was prepared by Steve Litman, who brought it to the original meeting with Wayne Newton, where it was reviewed by the parties there.

Exhibit 43 is entitled "Steve's Projections Wayne Newton Theater/Branson, Missouri/Revised 25–Mar–92." The objection was that the exhibit "calls for speculation" and that it was "a document which provides definition, could never have related to the real world because Mr. Newton

didn't pass on it, and lack of foundation for that reason."

■ The admission or exclusion of evidence, including exhibits, is a matter of trial court discretion, the ruling is presumed correct and the party complaining has the burden of showing the trial court abused its discretion and that they have been prejudiced. *IMR Corp. v. Hemphill,* 926 S.W.2d 542, 546 (Mo.App.1996). This Court reviews only specific objections which were presented to the trial court. *Robinson,* 906 S.W.2d at 836. Only objections raised in the trial court without change and without addition will be considered on appeal. *Id.*

The objection made at trial is not the contention now raised as to Exhibit 3. Therefore, it was not preserved. Exhibits 42 and 43 were necessarily speculative, as they were projections. However, they are indicative of services performed by Plaintiffs, as a part of inducing Wayne Newton to perform at the theater proposed by Defendants. As such, we cannot say that the trial court abused its discretion in admitting the exhibits. Point III is denied.

## EXPERT TESTIMONY ON VALUE OF SERVICES

■ For their fourth point, Defendants contend that the trial court erred "in allowing the expert testimony of C.K. Spurlock because his opinions were not supported by sufficient facts or evidence in that they were based on improper speculative projections found in Exhibit 43 and lacked foundation."

Plaintiffs contend that there was no objection on this basis to the Spurlock testimony, given by deposition. An examination of the transcript supports this contention. In their reply brief, Defendants state what their objections were, which is consistent with our view of the transcript. There, they stated that their objection was "that Spurlock's testimony was not subject matter proper for deposition testimony, the hypothetical questions

were overly broad and contained facts not in evidence and the hypothetical questions were not framed in an appropriate fashion ... that it would be an open-ended invitation for speculation based upon an inappropriate attempt at the presentation of facts" and "because it was based on an improperly phrased hypothetical question which called for rank speculation."

No reference was made to Exhibit 43 in the objections to the deposition. That exhibit played only a small part in Spurlock's testimony. Nor was lack of foundation or what that lack was made a part of the objection. As the contention now made was not presented to the trial court, this point is denied.

### "CHRISTIANITY" NOTE

■ For their fifth and remaining point, Defendants state:

V. The trial court abused its discretion in admitting into evidence Exhibit 44, the "Christianity" note because it was irrelevant, prejudicial and used as improper impeachment in that it had nothing to do with the issues in the case and was never published to anyone but rather, the sole purpose in admitting the exhibit was to inject religious views into the case to inflame the jury.

The exhibit was a note written by Defendant Gary W. Snadon, which he said he wrote after Wayne Newton's first performance in May of 1993, at the theater in Branson. The proceeds from that performance were to be donated to the School of the Ozarks, but its president declined the contribution, making the announcement at a press conference. Snadon said he wrote the note out of his belief that the School of the Ozarks was exploiting the situation to enhance donations to it and harm the theater. He said it was never sent to anyone.

According to the transcript, the note, as read by Gary Snadon, said: "Christianity and world values can be exploited for per-

sonal gain as surely as can how much money is pumped into the tourist-oriented economy." Plaintiffs state that the transcript is erroneous in that the word "world" was not used but "moral" was before "values." In reading the handwritten exhibit, it appears, although it is not absolutely clear, that "moral" was used. Plaintiffs contend that the note was relevant, as it related to Gary Snadon's credibility. What, if anything, it reflected on his credibility was likely outweighed by its potential prejudice in inferring to the jury that Snadon believed in exploiting Christianity and moral values, not something that should have been relevant here.

■ We agree that ordinarily the note would have no relevance and be prejudicial, as it appears to question the character of Defendant Gary Snadon. With certain exceptions not here relevant, the character of a party in a civil action is not admissible. *See Williams v. McCoy*, 854 S.W.2d 545, 557 (Mo.App.1993); *Ackerman v. Watson*, 690 S.W.2d 498, 499 (Mo.App. 1985). However, where evidence relating to character is introduced then the opposing party may rebut it by other evidence which goes to character. *See Williams*, at 558; *Ackerman*, at 499.

On direct examination, Defendant Gary Snadon testified he was on the ethics committee of the American Resort and Development Association. He said that the ethics committee "[c]reates guidelines and attempts to make certain that the—that there's not developers out there that aren't trying to do it within the law." This was supposedly the reason he had to return to Las Vegas, but the effect of the detail can only be, as far as we can tell, to at least infer that Gary Snadon was ethical and so acknowledged by other real estate developers. The jury might have so interpreted this testimony. Under these circumstances, we cannot say that the trial court abused its discretion in allowing the document.[2]

**2.** The definition of "exploit" includes "[t]o make use of ... unethically." THE AMERICAN

In reviewing a claim of error in admitting evidence, we look to see if the trial court abused its discretion, resulting in prejudice to the appellant. *IMR Corp.*, 926 S.W.2d at 546. The trial court's ruling is presumed correct and appellant bears the burden of showing an abuse of discretion and prejudice. *Id.*

If the jury believed Gary Snadon's explanation, then the note would not appear to have been prejudicial. That, of course, was for them to decide. However, if they did not believe his explanation, then the note may have rebutted his inference that he was ethical in his business operations. Point V is denied.

The judgment is affirmed.

CROW, J., concurs, and PARRISH, J., concurs in separate opinion.

JOHN E. PARRISH, Judge, concurring.

I concur in Points II through VI. I concur in the result reached with respect to the issue in Point I, defendants' allegation that it was error to package the jury instructions in this case. I am not convinced that packaging was required, but I perceive no prejudice to defendants by the use of that technique.

HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, p. 463 (1978).