Clifford W. MURPHY, Trustee, American Drilling Service Company Liquidating Trust, Plaintiff-Respondent,

v.

CITY OF SPRINGFIELD, Missouri, Defendant-Appellant.

No. 14839.

Missouri Court of Appeals, Southern District, Division Two.

Aug. 27, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 21, 1987.

Application to Transfer Denied Nov. 17, 1987.

Sharon F. Daily, Greensfelder, Hemker, Wiese, Gale & Chappelow, P.C., St. Louis, for plaintiff-respondent.

Robert H. Handley, Asst. City Atty., Springfield, for defendant-appellant.

PREWITT, Presiding Judge.

Defendant City of Springfield appeals from a judgment, following jury trial, in favor of plaintiff for $30,137.71. Defendant presents five points alleging trial error.

After taking competitive bids, defendant contracted with Ted Wilkerson, Inc. (Wilkerson) for Wilkerson to reconstruct a bridge known as the Benton Avenue Viaduct. American Drilling Service Company (American), a corporation, entered into a "Subcontractor Subcontract" dated May 24, 1977 with Wilkerson. Under that agreement American was to "provide labor, material, equipment, supervision, knowhow and others to construct approximately twenty-eight (28) straight shaft foundation caissons" on which piers to support the viaduct would be placed, in accordance with plans and specifications prepared by defendant. The caissons were to be of three different diameters, 42 inches, 48 inches, and 54 inches. They were to be set on a six inch minimum "seat" into "solid bedrock". Apparently in the Springfield area the bedrock is limestone. American agreed to perform the caisson work for $59,655, subject to certain "unit quantity additions or deductions".

Previous to entering into the subcontract, American submitted a bid for the caisson construction to Wilkerson and other general contractors who were contemplating bidding on the project. In preparing its bid American used information shown on a sheet denominated "Boring Logs" which was a part of the specifications prepared by defendant and available for the use of bidders on the project. That sheet purported to show the materials found as a result of subsurface drilling of 13 holes at or near where the caissons were to be constructed. The borings were 4 inches in diameter. Twelve of the thirteen drillings went into "limestone", apparently indicating bedrock, three of those into "weathered" limestone. The "NOTES" on the sheet showing the results of the boring stated:

> Subsurface information shown on this drawing was obtained solely for use in establishing design control for the project. The accuracy of this information is not guaranteed and it is not to be construed as part of the plans governing construction of the project. It is the bidder's responsibility to inquire of the engineer if additional information is available, to make arrangements to review same prior to bidding, and make his own determinations as to all subsurface conditions.[1]

---

1. For a discussion of the effect of somewhat similar "disclaimers", see *Sanders Co. Plumbing and Heating v. City of Independence*, 694 S.W.2d 841, 846 (Mo.App.1985); *Ideker Inc. v. Missouri State Highway Commission*, 654 S.W.2d 617, 622–623 (Mo.App.1983). No question directly

Plaintiff presented evidence that notwithstanding such language as just above quoted, it was customary in the construction industry for drilling contractors to rely on the information from boring logs in determining the subsurface materials anticipated and ultimately the price that they would quote for such work. A former employee of American and an expert who testified for plaintiff both testified that such information was routinely relied on and that it would be impractical for bidders to seek their own subsurface information. The expert witness also stated that there were better methods of drilling and other tests which would provide more accurate information than the method used by the City here.

A consulting engineer for the City testified that the borings went down "to about where the rock [apparently bedrock] is and usually a few feet into that rock to make sure that we're into rock and not necessarily a boulder or something like this." He said that the Springfield area had "karse"[2] topography, an irregular rock formation under the surface that is "just up and down" with crevices. The witness said this is apparent as you drive through highway cuts in the area. He said that the information you get by such a drilling is only for the 4 inches as to get fully accurate information you would have to do all the excavation. The engineer said that the purpose of the drillings was to determine how far down the bedrock was. He said that because of the irregular rock in the area, "you just cannot rely" upon the borings. The gist of his testimony was that a contractor should not rely upon those borings in determining what materials would be encountered on the way to bedrock.

The defendant's plans and specifications required that the contractor submit a unit price per lineal foot for the caisson shafts. If drilling the shafts resulted in more lineal feet, then a contractor would receive an additional amount and if it was less, then this same amount per foot would be deducted. American's vice president, who prepared their proposals to potential general contractors, felt that this method of payment was unfair because the same unit price would be used whether the caisson shafts were 42 inches in diameter, 48 inches in diameter, or 54 inches in diameter. In their proposal to general contractors, including Wilkerson, they set out separate unit prices for each of the three diameters instead of one for lineal feet. American's bid was based on cubic yards rather than lineal feet with a price set for "earth shaft excavation" and a much higher price for "rock shaft excavation".

In a letter to Wilkerson dated April 13, 1977, American set forth certain quantity unit prices per cubic yard and stated that it "must use these qualifications and revisions to the bid form due to the significant unknowns and inequities within the presently structured unit prices." In a later letter to Wilkerson, dated five days before the subcontract was entered into, which letter was to be "incorporated into any contractual agreement", certain unit prices per cubic yard were preceded by the statement that "[i]n the event subsurface conditions warrant changes in the caisson quantities, the following unit prices will apply."

Plaintiff's witnesses testified that the subsurface was substantially different from that indicated by the boring logs. There was testimony that American encountered more "ground water" and 104.6 cubic yards of rock more than could be contemplated from the subsurface information shown in the boring logs; that there was also extra casing and concrete costs which would not have been anticipated on the information furnished; resulting in additional costs of $91,326.40 to American. Defendant presented evidence indicating that American's costs over those contemplated were not as a result of subsurface conditions, but inexperience and poor construction techniques.

concerning the effect of the instant disclaimer is raised.

**2.** Karse, apparently karst, appears to have been misspelled in the transcript. Karst as defined in Webster's New Collegiate Dictionary, p. 625 (1980), is "an irregular limestone region with sinks, underground streams, and caverns".

Plaintiff's claim was filed on a theory denominated here by plaintiff's counsel as "innocent misrepresentation", based on cases where public contractors were misled by plans and specifications. Plaintiff primarily relies on *Clark v. City of Humansville*, 348 S.W.2d 369 (Mo.App.1961). Other similar cases are *Sanders Co. Plumbing and Heating v. City of Independence*, 694 S.W.2d 841 (Mo.App.1985); *Ideker, Inc. v. Missouri State Highway Commission*, 654 S.W.2d 617 (Mo.App.1983); and *Bernard McMenamy Contractors, Inc. v. Missouri State Highway Commission*, 582 S.W.2d 305 (Mo.App.1979). But see *Air Cooling & Energy v. Midwestern Const. Co.*, 602 S.W.2d 926 (Mo.App.1980). See also Annotation, Right of public contractor to allowance of extra expense over what would have been necessary if conditions had been as represented by the plans and specifications, 76 A.L.R. 268 (1932). See generally Alfred Hill, Damages For Innocent Misrepresentation, 73 Colum.L.Rev. 679 (1973), Samuel Williston, Liability For Honest Misrepresentation, 24 Harvard L.Rev. 415 (1911); 2 Harper, James and Gray, The Law of Torts, § 7.7 (2d ed. 1986).

*Sanders*, 694 S.W.2d at 846, denotes this type of action as "in the nature of a breach of warranty based on a positive misrepresentation of material fact by a government entity." If plaintiff has a cause of action, it would be based on the theory stated in *Sanders*, which we construe as the same theory set forth in *Clark v. City of Humansville*. The nature of plaintiff's claim and its necessary elements are considered further in discussing defendant's points.

The first point presented by defendant is that the trial court erred in not granting its motion for summary judgment, motion for directed verdict, and motion for judgment notwithstanding the verdict. It contends that because American was a subcontractor it could not bring suit against the owner for additional work and expenses "because the Missouri Constitution, Article 3, Section 39(.4) prohibits payment of claims for work and materials furnished where there is no authorized contract, and because American did not avail itself of its statutory remedy under Section 522.300, RSMo."

■ We first discuss the effect of the Missouri Constitutional provision cited. The portion of Mo. Const. Art. III, § 39 referred to by defendant states:

**Section 39. Limitation of power of general assembly.**

The general assembly shall not have power:

\*   \*   \*   \*   \*   \*

(4) To pay or to authorize the payment of any claim against the state or any county or municipal corporation of the state under any agreement or contract made without express authority of law; \* \* \* \*

■ Plaintiff's claim is not "under any agreement or contract", although it is incidentally related to the contract American made with Wilkerson. American did not have a contract with defendant. Plaintiff's claim is based upon misrepresentation by which it was induced to bid and enter into a contract with Wilkerson for a lower amount than it would have agreed to. See *Clark v. City of Humansville*, supra, 348 S.W.2d at 371–372. Such a claim is fundamentally tort in character. Id. at 372.[3] The constitutional provision in question, relating as it does to agreements or contracts, does not foreclose plaintiff's claim.

Defendant questions whether this type of action can be brought by a subcontractor who had no contractual relationship with the defendant. Defendant emphasizes that in each Missouri case allowing recovery the plaintiff had a contract with the defendant.

■ Privity of contract is generally not required in an action for breach of warranty as it is basically a tort action. *Morrow v. Caloric Appliance Corporation*, 372

---

**3.** In determining that this action is a tort we have not ignored that *Ideker* refers to such actions as "a cause of action ex contractu in the nature of a breach of warranty". 654 S.W.2d at 620–621. However, we have concluded that the analysis in *Clark* of the nature of this type of action is correct. Fortunately we are not called upon here to consider the effect of sovereign immunity. On this see the discussion in *Ideker*, 654 S.W.2d at 621.

S.W.2d 41, 52–55 (Mo. banc 1963). As this claim "sounds in tort", contract principles do not govern. *Clark*, 348 S.W.2d at 374. See also *Holt v. Burlington Northern Railroad Co.*, 685 S.W.2d 851, 854 (Mo. App.1984) (Privity is a contract concept not applying to tort actions). But see *Crowder v. Vandendeale*, 564 S.W.2d 879, 882 (Mo. banc 1978) (implied warranty of construction of house only applies to first purchaser); *Chubb Group of Insurance Companies v. C.F. Murphy & Associates*, 656 S.W.2d 766, 782 (Mo.App.1983) and *John H. Armbruster & Co. v. The Hayden Company-Builder Developer, Inc.*, 622 S.W.2d 704 (Mo.App.1981) (both cases following *Crowder*).

In the house cases the quality of the construction is implied from the contract. That the houses were properly constructed was an implied element of the contract between the original purchaser and the contractor. Essentially then the action was on the contract. Here, the claimed misrepresentation was not a part of the contract plaintiff entered into, but led to it. Following *Clark v. City of Humansville*, that this is basically a tort action for misrepresentation, we conclude that privity is not required and that American being a subcontractor does not prevent this claim.[4]

■ We turn now to the contention that § 522.300, RSMo 1978, bars plaintiff's claim. That section provides for "**BONDS OF CONTRACTORS FOR PUBLIC WORKS**". It allows persons or entities furnishing materials or performing labor to sue on such a bond. Nothing in that section or in any other authority cited to us by defendant indicates that this is the exclusive remedy for a subcontractor. We see no reason why it should be, and as plaintiff's claim is based on misrepresentation on the part of defendant, who did not put up the bond, whether plaintiff could have sued on such a bond on the theory presented here is questionable. Defendant's first point is denied.

Defendant contends that the instruction upon which plaintiff's claim was submitted to the jury was erroneous "in that it did not require the jury to find that the alleged misrepresented facts were capable of accurate ascertainment, or that the alleged misrepresented facts were material, or that the defendant intended for the plaintiff to rely thereon." Defendant asserts that these omitted findings are necessary elements according to *Clark v. City of Humansville*, supra. Besides citing *Clark*, defendant also states that MAI 23.05 [1981] "**Verdict Directing—Fraudulent Misrepresentations**", "provided a reasonable model" which could have been used here. The instruction in question is set forth below.[5]

■ *Clark* discusses materiality, 348 S.W.2d at 373, capability of accurate ascertainment, id. at 372, 373, and intent to rely. Id. at 374. It does not, however, specifically list the elements of a cause of action for this type of misrepresentation. Referring to *Ideker, Sanders*, 694 S.W.2d at 846, sets forth six elements "for a cause of action in the nature of a breach of warranty based on a positive misrepresentation of material fact by government entity." These are:

---

**4.** Privity of contract is not required in an action for negligent misrepresentation of information compiled from soil sampling and soil compaction tests. *AAA Excavating v. Francis Const.* 678 S.W.2d 889, 893 (Mo.App.1984).

**5.** In your verdict you must assess a percentage of fault to defendant if you believe:

First, Defendant represented in the plans and specifications that certain underground rock and water conditions existed at the Benton Avenue Viaduct site; and

Second, Plaintiff relied upon the represented rock and water conditions at the Benton Avenue Viaduct site in estimating the cost of drilling and constructing the foundation caissons and in preparing its bid; and

Third, the rock and water conditions encountered by Plaintiff in performing work on the foundation caissons were different from the represented rock and water conditions; and

Fourth, Defendant's representations regarding underground rock and water conditions at the Benton Avenue Viaduct site were incorrect and Plaintiff did not know that they were incorrect; and

Fifth, as a direct result of the underground rock and water conditions at the Benton Avenue Viaduct site being different than as represented by the plans and specifications, Plaintiff was damaged.

"(1) a positive misrepresentation [6] by the entity

(2) of a material fact

(3) that is false or incorrect

(4) lack of knowledge by the contractor that the positive representation is false or incorrect,

(5) reliance by the contractor, and

(6) damages sustained as a direct result of the positive representation."

The six required elements for such a claim, at least if disputed, should have been submitted to the trier of fact for determination. Although "accurate ascertainment" is not listed in *Sanders* as an element it appears to be related to the "positive misrepresentation" there required. That element is substantially submitted by paragraph first and paragraph fourth of the submission instruction.

■ Although it may be questioned whether there could be a "positive misrepresentation" of underground conditions, such cases have been maintained. In *Sanders* the subsurface drilling information was inaccurate.[7] In *Bernard McMenamy Contractors, Inc. v. Missouri State Highway Commission*, supra, 582 S.W.2d 305, underground conditions were misrepresented. *United States v. Atlantic Dredging Co.*, 253 U.S. 1, 40 S.Ct. 423, 64 L.Ed. 735 (1920), involved erroneous information given following boring of material to be dredged from the Delaware River. Based on such cases as those and recognizing that it would be impossible to be entirely accurate regarding such information, if the information furnished is substantially inaccurate, as the evidence of plaintiff here indicated, then a cause of action can be based upon misrepresentations of subsurface condition. Of course, the necessary elements of such a cause of action would also have to be present.

Plaintiff pled that the representations of subsurface conditions were "material". However, plaintiff contends that he was not required to submit that to the jury because it was not essential, but if essential it was undisputed, citing *Husar Industries v. A.L. Huber & Son, Inc.*, 674 S.W.2d 565, 574 (Mo.App. 1984) (not reversible error to omit from instructions undisputed facts).

■ That a representation is "material" is a fact to be submitted to a jury where a claim is made based on fraudulent misrepresentation. See MAI 23.05 [1981]. The same type of materiality would seem to be required whether an action is based on fraud or the breach of warranty theory described in *Sanders*. If materiality is a jury question in fraud cases, where misrepresentation is claimed, no reason is advanced why it would not be here.[8]

"A representation is material if it relates directly to the matter in controversy and is of such a nature that the ultimate result would not have followed it if there had been no representation, or if the one who acted upon it had been aware of its falsity." *Schoen v. Lange*, 256 S.W.2d 277, 281 (Mo.App. 1953). See also 37 Am.Jur.2d Fraud and Deceit § 177, p. 236 (1968); 37 C.J.S. Fraud § 18, p. 252 (1943).

"A material fact is one to which a reasonable person might attach importance in choosing his course of action, ... in other words it is a fact that could reasonably be expected to influence the conduct of a person with respect to the transaction in question." *Nader v. Allegheny Airlines, Inc.*, 445 F.Supp. 168, 174 (D.D.C.1978), rev. on other grounds, 626 F.2d 1031 (D.C. Cir. 1980). See also *Clark*, supra, 348 S.W.2d at 373 ("to which a reasonable man would attach importance in determining his choice

6. *Ideker* says "representation", 654 S.W.2d at 621. In the context used we prefer that word.

7. "What is and what is not a 'positive representation' will always be a question to be answered by the trier of fact case-by-case." *Sanders*, 694 S.W.2d at 847.

8. There is authority indicating that whether a representation is material is one of law for the court rather than a fact for the jury. 37 Am. Jur.2d Fraud and Deceit § 181, p. 243 (1968). See also *Monsanto Chemical Works v. American Zinc, Lead & Smelting Co.*, 253 S.W. 1006, 1010 (Mo.1923) ("If by 'material' is meant the actionable character of the representations, then it is purely a question of law").

of action in the transaction in question"); *Cousineau v. Walker*, 613 P.2d 608, 613 (Alaska 1980) (a fact which could reasonably be expected to influence someone's judgment or conduct concerning a transaction).

■ Although the City did not offer direct evidence that American did not use the subsurface information from the boring logs in compiling its bid, it never agreed that the information was material to American's loss. The test is not whether American relied upon the subsurface information as it insists that it did, but whether a reasonable person would rely on it in determining subsurface conditions to be encountered. Whether a reasonable person would have done so was in dispute. Defendant relies on the "disclaimer" set forth earlier and other evidence in contending that the boring logs were not such that a reasonable person should have attached importance to them in determining the quantities of rock and water to be encountered in drilling the caisson shafts.

Defendant contends that the borings were intended to project the depth of excavation and were "remarkably close" for that purpose. Defendant presented evidence that the amount of excavation was actually 17.25 linear feet less than the 616.5 feet projected by the boring logs. The City contends that the boring logs were not intended to be and would not be material to preparing a bid for a contractor who would be paid on the basis of quantities of earth and rock. It contends they were to be only used in conjunction with the specifications which stipulated that contractors would be paid unit price adjustments based on the depth of their excavation. Defendant asserts that American misused this information when it tried to use the boring logs to estimate quantities of rock, and apparently absence of water.

The City's evidence was that the borings were done "basically to locate about where the bedrock can be expected." However, the sheet denominated "boring logs" gave more information than that. It showed the materials that were encountered on the way to bedrock, such as "clay", "silty clay", "wet soft brown silty clay", "ground water", "chert gravel", "lmst.pinn." (apparently limestone pinnacle) and others, including limestone, before reaching the limestone bedrock.

Certainly, if plaintiff's evidence is believed, the boring logs were material. However, that materiality is disputed by defendant. It did not, as it would be difficult to do, offer direct evidence that American did not rely on the boring logs. Obviously, it would be difficult for it to know after the fact. The City contends that in the manner used the boring logs were not and should not have been material to a reasonable person as their purpose was not to determine the quantities of rock or water. Whether the information was material was a jury issue.

We also agree that the jury should determine if defendant intended for the boring information to be relied upon in the manner it was. Defendant made it a part of the information to bidders, but said for a different purpose than American used it. *Clark* indicates that intent that the information given be relied upon, is a necessary element of plaintiff's case. See 348 S.W.2d at 374. MAI 23.05 also requires that intent be submitted. *Ideker* and *Sanders* do not include it as an element, but in those cases that did not appear to be an issue. Here it was. Whether the boring information was intended to be used only for determining the length of the caisson shafts or the City was aware and intended that a general or subcontractor would use it to determine cubic quantities is a question for the trier of fact.

■ Obviously, omitting disputed factual elements of a cause of action from the trier of facts' determination could be prejudicial. Not requiring the jury to find that the subsurface information contained in the boring logs was such that it would be material, and defendant intended that American rely in the manner it did, was prejudicially erroneous and requires reversal of the judgment. Because they might arise again on retrial, defendant's remaining points are discussed.

American initially filed this suit against Wilkerson and the City. Following an appeal here, see *American Drilling Service Company v. City of Springfield*, 614 S.W.2d 266 (Mo.App. 1981), a separate trial was granted on its claim against Wilkerson. Pursuant to a directed verdict judgment was entered for plaintiff for $9,503.84 plus interest. After the trial of the instant claim that judgment was satisfied.

This leads to another of defendant's points. In it defendant contends that the trial court erred in failing to grant its motion for directed verdict and motion for judgment notwithstanding the verdict because "the previously litigated issue of plaintiff's damages" prevented the jury from assessing damages that conflicted with those found in plaintiff's claim against Wilkerson. Plaintiff contends that this is required by the "doctrines of res judicata and collateral estoppel because the issue of damages had been fully litigated in the previous trial and because the City was in privity with defendant Wilkerson vis-a-vis their contract for construction of the Benton Avenue Viaduct."

■ The damages awarded against Wilkerson and the City were not the same. Plaintiff recovered from Wilkerson the balance due under American's contract with Wilkerson. If plaintiff's evidence is believed, and we must assume it was, American suffered damages because American did not include certain costs in its bid to Wilkerson, which later resulted in the contract between them, because of misstatements in the subsurface information supplied by the City. The damages sought here are excess costs over the amount paid by Wilkerson.

Res judicata or claim preclusion prevents the same parties from relitigating the same cause of action, whereas collateral estoppel precludes the relitigation of previously adjudicated issues. *Oates v. Safeco Ins. Co. of America*, 583 S.W.2d 713, 719 (Mo. banc 1979).

Collateral estoppel or issue preclusion operates only as to issues actually litigated. *Sunshine Realty Corp. v. Killian*, 702 S.W.2d 95, 99 (Mo.App. 1985). As neither the cause of action nor issues against Wilkerson were the same as here, res judicata and collateral estoppel do not apply. This contention is denied.

The next point of defendant's that we discuss states that in entering judgment the trial court should have applied comparative fault. Initially the case was submitted to the jury on that theory and it assessed fault against both parties. After considering after-trial motions the trial court determined that comparative fault principles were inapplicable and entered judgment for the total damages found by the jury.

Defendant states that entering judgment without aportionment of fault was erroneous "because contributory negligence was an affirmative defense in negligent misrepresentation cases before *Gustafson v. Benda*, [661 S.W.2d 11 (Mo. banc 1983)] and *Gustafson* was intended to mitigate the harshness of the doctrine of contributory negligence."

■ Generally, comparative fault was adopted for Missouri in *Gustafson*. For an excellent discussion of the anticipated effect of *Gustafson*, see Comment, Ronald A. Conway, Comparative Fault in Missouri, 50 Mo.L.Rev. 141 (1985). The Uniform Comparative Fault Act, together with the commissioner's comments was appended to *Gustafson* by appendix, the court stating that "[i]nsofar as possible this and future cases shall apply the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act". 661 S.W.2d at 15.

In *Lippard v. Houdaille Industries, Inc.*, 715 S.W.2d 491, 492–493 (Mo. banc 1986), holding that comparative fault principles do not apply to "strict products liability cases", the court stated:

> There has been confusion because annotated sections of the Uniform Comparative Fault Act were appended to the *Gustafson* opinion, as a guide to proceedings in comparative fault cases. It was not the purpose of *Gustafson* to enact that model act as a virtual statute of the state of Missouri, to establish substan-

tive principles controlling cases not then before the Court. Much less was there any purpose of giving special authority to the annotations and commissioners' comments. The direction in the opinion was simply to apply the procedures of the Uniform Comparative Fault Act "insofar as possible."

*Lippard* indicates that the Uniform Comparative Fault Act is not to be literally followed, and the commissioner's comments less so, but we doubt that Missouri will apply comparative fault any broader than the Act. We look to it and the comments for guidance as the Eastern District of this court recently did in *Allison v. Sverdrup & Parcel and Associates, Inc.*, 738 S.W.2d 440 (Mo.App.1987). The Act and the comments indicate that comparative fault would not apply here.

Uniform Comparative Fault Act (U.L.A.) § 1(a) states that the Act covers "damages for injury or death to person or harm to property". The Commissioners' comments following that section appear to be consistent with how we would view the quoted language. Those comments say that *"Harms Covered"*, are "... confined to physical harm to person or property.... It does not include matters like economic loss resulting from a tort such as negligent misrepresentation". Here, the loss was

not from physical harm and this action, if not based upon negligent misrepresentation, is closely related to it.[9] For those reasons we conclude that comparative fault is not applicable. This point is denied.

Defendant asserts in its remaining point that the trial court erred in allowing plaintiff Clifford Murphy to prosecute American's claim and in overruling defendant's objection to a trust agreement entitled "American Drilling Service Co. Liquidating Trust" because there was no evidence of American's corporate existence on the date of that trust agreement and the exhibit "was received into evidence without foundation as to the existence of corporate shareholders or director's minutes to authorize the alleged assignment in violation of the best evidence rule."

■ The trust agreement was signed by Clifford W. Murphy as "Sole shareholder", signed again by Mr. Murphy as "Trustee" and signed for American "by Clifford W. Murphy, President." The trust agreement purported to give plaintiff the authority to "[p]ursue all claims in favor of American" and its claim against defendant was assigned to plaintiff "in trust, for the creditors and stockholder of the company".

Evidence of American's corporate existence on the date of the trust agreement

---

9. Although as earlier noted, plaintiff's counsel denotes this as a claim based on "innocent misrepresentation", negligence crept into plaintiff's claim. Plaintiff's expert witness testified to more accurate methods of underground exploration that should have been used by the City. In *Clark v. City of Humansville,* supra, although the misrepresentation of the quantity of earth to be excavated may have been "innocent", it likely resulted from negligence or fault. The same is true of other cases in Missouri where public contractors have recovered based on misrepresentation: *Sanders Co. Plumbing & Heating v. City of Independence,* supra, (three-year-old drilling "represented as showing present conditions.") 694 S.W.2d at 846; *Ideker, Inc. v. Missouri State Highway Commission,* supra, (miscalculation in amount of waste material) 654 S.W.2d at 620; *Bernard McMenamy Contractors, Inc. v. Missouri State Highway Commission, supra,* (plans incorrectly indicated the character of rock contrary to information available to defendant) 582 S.W.2d at 313.

The Restatement (Second) of Torts § 552 covers: "Information Negligently Supplied for the

Guidance of Others". Illustration 9 following that section states:

The City of A is about to ask for bids for work on a sewer tunnel. It hires B Company, a firm of engineers, to make boring tests and provide a report showing the rock and soil conditions to be encountered. It notifies B Company that the report will be made available to bidders as a basis for their bids and that it is expected to be used by the successful bidder in doing the work. Without knowing the identity of any of the contractors bidding on the work, B Company negligently prepares and delivers to the City an inaccurate report, containing false and misleading information. On the basis of the report C makes a successful bid, and also on the basis of the report D, a subcontractor, contracts with C to do a part of the work. By reason of the inaccuracy of the report, C and D suffer pecuniary loss in performing their contracts. B Company is subject to liability to B [sic] and to D.

An action for negligent misrepresentation of subsurface conditions was recognized in *AAA Excavating v. Francis Const.,* supra note 4.

was not required. It is not disputed that American had been validly formed. Once a corporation has been formed according to law, in the absence of evidence to the contrary, it is presumed to continue in existence. 18 C.J.S. Corporations § 75, p. 461. The question of foundation is not further discussed as, even if valid, the lack of foundation complained of may be present upon retrial.

The judgment is reversed and the cause remanded for a new trial.

HOGAN, FLANIGAN and MAUS, JJ., concur.