**UNNERSTALL CONTRACTING CO., LTD., Respondent,**

v.

**CITY OF SALEM, Missouri, Appellant,**

**and D.R. Felton & Associates, Inc., Respondent.**

No. 21422.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 17, 1997.

Motion for Rehearing or Transfer to Supreme Court Denied Jan. 9, 1998.

Application for Transfer Denied Feb. 24, 1998.

**2**

Thomas M. Pavelko, St. Louis, for appellant.

Christopher J. Daus, Greensfelder, Hemker & Gale, P.C., St. Louis, for respondent Unnerstall Contracting Co., Ltd.

Michael R. Allen, Welsh & Hubble, P.C., St. Louis, for respondent D. R. Felton & Associates, Inc.

CROW, Judge.

In this suit, Unnerstall Contracting Co., Ltd. ("UCCL") and D.R. Felton & Associates, Inc. ("DRF&A") asserted claims against the City of Salem ("Salem") for services performed during an improvement project at Salem's airport. Following a jury trial, the court entered judgment (a) awarding UCCL $188,671.31 on one count and $83,067.36 on another, and (b) awarding DRF&A $26,-279.04.

Salem appeals. An account of the facts is a prerequisite to a discussion of Salem's four assignments of error.

Viewed favorably to the judgment, *Seward v. Terminal Railroad Assn.*, 854 S.W.2d 426, 427–28[1] (Mo. banc 1993), the evidence established that DRF&A and Salem entered into a contract dated July 25, 1989, wherein DRF&A agreed to provide engineering services for the project. According to the contract, the project included reconstructing, widening, extending, marking and lighting a runway, and constructing, marking and lighting a taxiway.

Services to be performed by DRF&A included "preliminary studies." During that phase, a "geo-tech engineer" made "soil borings" to discover what lay beneath the surface of the earth at the project site. DRF&A needed that data "in order to make proper decisions in design."

DRF&A prepared "Contract Specifications" and plans. The plans included a 20-page document denominated "Runway Extension." The document was received in evidence as Exhibit 1.

Page 9 of Exhibit 1 is designated "Soil Boring Plan & Profile." It shows the results of the soil borings on a drawing. The drawing represents a side view of the earth, from the surface to a depth of approximately twenty feet, along the route of the proposed runway. We henceforth refer to the drawing as "the site profile."

Four lines appear on the site profile. One represents the surface of the earth at the time the borings were made. This line shows that the surface rises irregularly in elevation from north to south along the route of the proposed runway.

Another north-to-south line shows the elevation of the proposed runway. This line, a straight one, rises gradually and uniformly in elevation as it proceeds from north to south.

At the north end of the proposed runway, the elevation of the runway is above the earth's surface. As the proposed runway proceeds south, the distance between its elevation and the surface of the earth gradually diminishes until the elevations coincide. From that point on, proceeding south, the elevation of the proposed runway lies below the existing surface of the earth. As we understand the site profile, at one point the projected surface of the proposed runway is some 12 feet below the existing surface of the earth.

The third line on the site profile lies entirely beneath the surface of the earth as it existed when the soil borings were made. That line is designated "auger refusal line." Like the other two, it proceeds from north to south along the route of the proposed runway.

The fourth line on the site profile lies entirely beneath the third line. The fourth line is designated "roller bit refusal line." Like the other three, the fourth line proceeds

from north to south along the route of the proposed runway.

Copies of the plans and specifications prepared by DRF&A were available to contractors interested in submitting bids to Salem to perform work on the project.

UCCL obtained a copy of the plans and specifications from DRF&A. Leonard B. Unnerstall ("Unnerstall"), president of UCCL, testified that UCCL contracts to perform work such as "sewers, excavation, grading, lift stations, and road work, airports."

Unnerstall explained that in the "construction business," the term "rippable material" refers to boulders, clay and other substances in the earth which can be penetrated and removed using a bulldozer "with a shank on the back of it."

Unnerstall and one of UCCL's engineers prepared a bid on the airport project, using the plans and specifications prepared by DRF&A, including the site profile.

Unnerstall recounted to the jury that an auger is "like a screw-type or an old type posthole digger ... it drills through the soil and brings up a sample." Unnerstall further explained that the auger refusal line on the site profile represents the depth "where the auger would not go any deeper." He added: "It indicates that the material is hard. It could be real hard earth and an auger would possibly stop."

Dean R. Felton ("Felton"), a licensed civil engineer and president of DRF&A, told the jury that a roller bit is "a mechanical device that ... has a series of ... gears on the end and they grind the material up so that it can lift up material." A roller bit refusal line means "it's going to require a little bit of weight on it in order to help force it into the material."

The roller bit refusal line on the site profile, according to Unnerstall, represents "where they hit some real hard material that more than likely was solid rock." Anything beneath the roller bit refusal line would not be rippable, while anything above that line "would be material that you could estimate is rippable material."

Unnerstall did not expect to encounter any non-rippable material on the project, as the elevation of the proposed runway, although below the existing surface of the earth along part of the route, lay entirely above the roller bit refusal line.

Felton confirmed that the site profile showed that construction of the runway would not require "excavation of any nonrippable material," as all required excavation is "above [the] line of rippable material." Felton's testimony continued:

"Q. If you had known that there was nonrippable rock to be excavated on this job, would your design have been any different?

A. If our drillings had shown that there was rock, yes, we probably would have changed the grade level.

Q. You would have moved the runway up higher to avoid that rock, is that correct?

A. That's the normal procedure."

On April 2, 1990, a "pre-bid meeting" was held at city hall in Salem. Felton conducted the meeting. Asked its purpose, Felton answered, "Just to allow the contractor to ask questions for clarification of the documents, things of that nature."

During the meeting, Felton told the attendees that in his opinion, "all material to be excavated on the project would be rippable."

Unnerstall did not attend the meeting; however, he "contacted a couple other contractors" who were there. He understood from one of them that Felton had said "it would all be rippable material."

In preparing UCCL's bid, Unnerstall calculated "a single price for excavation work." The price included no cost for excavating non-rippable rock. Unnerstall avowed that had the site profile shown there was non-rippable rock to be excavated, UCCL's bid price for excavation would have been "[p]robably four or five times higher."

UCCL was "low bidder" on the project. Salem awarded UCCL the contract. It was signed May 24, 1990. The "contract price" was $728,193.

After "a month or so or less" on the project, UCCL "hit unrippable material . . . that required drilling and blasting." Utilizing that method, UCCL excavated the material. In doing so, UCCL incurred "total additional costs" of $128,803.71.

Unnerstall testified that after UCCL completed the project, UCCL billed Salem for the $128,803.71 on July 13, 1991, but Salem paid none of that amount.

Unnerstall further testified that Salem withheld $60,375 as "retainage" under the contract and never paid UCCL any of that sum, even though UCCL fully performed the contract.

UCCL went to trial on three counts against Salem.

Count I was denominated "Breach of Warranty Ex Contractu." It prayed for the $128,803.71 additional costs allegedly incurred in excavating the non-rippable material, plus interest.

Count II was denominated "Breach of Contract," and sought payment of the $60,375 allegedly due under the contract but withheld by Salem as retainage, plus interest.

Count III was designated "Misrepresentation." It, like Count I, sought $128,803.71, plus interest, for excavating the non-rippable material.

DRF&A went to trial on two counts against Salem.

Count I pled that Salem owed DRF&A $17,922.30 for services performed by DRF&A under its contract with Salem—the contract mentioned in the third paragraph of this opinion. Count I prayed for judgment in that amount, plus interest.

Count II averred that the contract required Salem to "defend" DRF&A, but Salem refused. Count II further alleged that as of September 30, 1993, DRF&A had incurred legal fees and expenses totalling $7,839.21.[1] Count II prayed, inter alia, for that amount "plus whatever additional costs and fees are incurred until the conclusion of this litigation."

Upon completion of UCCL's evidence, Salem moved for a directed verdict in its favor on all three of UCCL's counts.

The trial court denied the motion. Salem then presented evidence.

Upon completion of Salem's evidence, UCCL moved for a directed verdict against Salem on UCCL's Count II, arguing that Salem had presented no explanation of its failure to pay UCCL the "contract balance" of $60,375. The trial court deferred ruling on UCCL's motion until all evidence was presented.

DRF&A then presented evidence, all of which pertained to its Count I.

Upon completion of all the evidence, the trial court granted UCCL's motion for a directed verdict in its favor on its Count II against Salem. The court awarded UCCL the $60,375 sought in Count II, together with $22,692.36 interest which had accrued since July 9, 1992. The total, $83,067.36, is the second sum mentioned in the first paragraph of this opinion.

UCCL also moved for a directed verdict in its favor on its Count I against Salem. The trial court denied that motion.

Salem moved for a directed verdict in its favor on UCCL's remaining counts against Salem (Counts I and III). The trial court denied that motion.

DRF&A then moved for a directed verdict in its favor on its Count I against Salem. The trial court denied that motion.

The trial court gave only one verdict-directing instruction authorizing a verdict for UCCL.[2] The instruction did not indicate whether it was submitting Count I or Count III; however, the facts hypothesized in the instruction demonstrate that it submitted

---

1. The record on appeal does not contain all of the pleadings filed at the trial level. Nonetheless, we infer from one of the pleadings that at some point in the ligation, someone asserted a claim against DRF&A.

2. The court gave an instruction withdrawing UCCL's Count II. The instruction informed the jury that Count II "has been decided by the Court and you are not to consider such issue in arriving at your verdict."

Count I.[3] The theory of Count I is set forth later in our discussion of Salem's first assignment of error.

The trial court gave only one verdict-directing instruction authorizing a verdict for DRF&A. The instruction did not indicate whether it was submitting Count I or Count II; however, the facts hypothesized in the instruction demonstrate that it submitted Count I.

The jury returned two verdicts. One awarded UCCL $128,803.71 (the amount prayed for in UCCL's Counts I and III), together with interest of $59,867.60. The total, $188,671.31, is the first sum mentioned in the first paragraph of this opinion.

The second verdict awarded DRF&A $17,-922.30 (the amount prayed for in DRF&A's Count I), together with "9% interest thereon from July 13, 1991." The third sum mentioned in the first paragraph of this opinion ($26,279.04) evidently represents the $17,-922.30 awarded DRF&A by the jury, together with interest at nine percent per annum from July 13, 1991, to date of judgment.

The judgment recites that the award of $188,671.31 to UCCL is on UCCL's Count I, and that the award of $83,067.36 to UCCL is on UCCL's Count II. The judgment does not mention UCCL's Count III, nor does the judgment specify whether the $26,279.04 awarded to DRF&A is on DRF&A's Count I or Count II.

It appeared to this court that inasmuch as the judgment (a) made no disposition of UCCL's Count III, and (b) disposed of only one of DRF&A's two counts—without indicating which—the judgment might not be appealable. *See: Birdsong v. Bydalek,* 905 S.W.2d 896, 897 (Mo.App. S.D.1995). Consequently, this court issued an order granting the parties an opportunity to show cause why the appeal should not be dismissed for lack of an appealable judgment.

In response, UCCL asserted that its Counts I and III pled alternative theories of recovery for the same claim, i.e., $128,803.71 for excavating the non-rippable material. UCCL acknowledged it was entitled to only one recovery on that claim, thus a judgment

for UCCL on its Count I precluded recovery by UCCL on its Count III. Accordingly, said UCCL, even though the judgment did not mention Count III, the judgment was appealable.

*Clayton Brokerage Co. v. Raleigh,* 679 S.W.2d 376 (Mo.App. E.D.1984), presented a situation similar to UCCL's. In that case, a plaintiff's petition pled two counts. Both sought recovery for the same claim, but on different theories. The appellate court held that because the judgment for the plaintiff on one count precluded recovery on the other, the judgment was final for purpose of appeal. *Id.* at 378[1].

■ Consistent with *Clayton Brokerage,* we hold the judgment in the instant case is not rendered unappealable because it fails to adjudicate UCCL's Count III. However, this issue could have easily been avoided had the parties tendered a judgment to the trial court disposing of Count III.

DRF&A responded to this court's order by asserting that inasmuch as (a) DRF&A presented no evidence in support of its Count II, and (b) tendered a verdict-directing instruction submitting only Count I, DRF&A abandoned Count II. In support of that premise, DRF&A cited *Murray v. Ray,* 862 S.W.2d 931 (Mo.App. S.D.1993).

In *Murray,* a plaintiff sued a corporation and four people. *Id.* at 932[1]. At the conclusion of the evidence, the plaintiff submitted his case against only the four people. *Id.* The jury returned verdicts for the plaintiff; the trial court entered judgment per the verdicts. *Id.* The judgment made no disposition of the plaintiff's claim against the corporation. *Id.* This court held the plaintiff abandoned his claim against the corporation, hence the judgment was appealable. *Id.*

■ We find nothing in the record in the instant case suggesting that DRF&A requested severance of its Count II prior to trial. Furthermore, the record demonstrates that all parties and the trial court intended that all claims be tried at the instant trial.

---

3. The instruction—Instruction 11—is set forth *in-*     *fra* in footnote 10.

We therefore hold DRF&A abandoned its Count II; consequently, the judgment, which adjudicates DRF&A's Count I (although failing to identify it as the count adjudicated) is final and appealable. *Murray, Id.* at 932[1]; *Young by and through Young v. Davis,* 726 S.W.2d 836, 837–38 (Mo.App. S.D.1987). However, we again emphasize that this issue could have easily been avoided had the parties tendered a judgment to the trial court specifically disposing of both of DRF&A's counts.

The first of Salem's four points relied on reads:

"The trial court erred in denying Salem's motions for directed verdict and motion for judgment notwithstanding the verdict or for new trial against Unnerstall[4] because Unnerstall had failed to make a submissible case.

1) Unnerstall presented no evidence of Salem's intent that the representations, if any be relied upon.

2) The alleged statements that Unnerstall relies on constitute statements of opinion, not positive representations."

UCCL's brief avers Salem failed to preserve its first point for review in that the statement of facts in Salem's brief is "inaccurate, misleading, biased and incomplete"—an alleged violation of Rule 84.04(c)[5]—and Salem's statement of facts and argument have insufficient page references to the legal file or transcript—an alleged violation of Rule 84.04(h).

Salem's brief is indeed vulnerable to UCCL's attack. However, we have concluded that the flaws are not egregious enough to render Salem's first point ineligible for review. Accordingly, we decline to summarily reject Salem's first point on the grounds urged by UCCL.

Nonetheless, we point out that Salem's first point is deficient under Rule 84.04(d), a deficiency unmentioned by UCCL.

Rule 84.04(d) states:

"The points relied on shall state briefly and concisely what actions or rulings of the court are sought to be reviewed and wherein and why they are claimed to be erroneous...."

The purpose of Rule 84.04(d) and the necessity of obeying it are exhaustively discussed in *Thummel v. King,* 570 S.W.2d 679, 684–88 (Mo. banc 1978).

Salem's first point tells us that the rulings we are to review include the trial court's denial of Salem's "motions" for directed verdict. The plural noun "motions" indicates Salem is attacking rulings on more than one motion for a directed verdict. However, in violation of Rule 84.04(d), the point fails to identify the motions which the trial court erroneously denied.

By process of elimination, we have deduced that the only denial of a motion for directed verdict that we must review in adjudicating Salem's first point is the trial court's denial of Salem's motion for a directed verdict in its favor on UCCL's Count I at the close of all the evidence.

We begin our analysis by recalling, as reported earlier in this opinion, that Salem moved for a directed verdict in its favor at the conclusion of UCCL's evidence. As we fathom that motion, it was directed solely toward UCCL's claims. As the motion was made before DRF&A presented evidence, Salem would not, at that point in the trial, have been entitled to a directed verdict in its favor on DRF&A's claims.

■ After the trial court denied the motion identified in the preceding paragraph, Salem presented evidence. By doing so, Salem waived any error in the denial of the motion. *Flanigan v. City of Springfield,* 360 S.W.2d 700, 704[2] (Mo.1962). Therefore, we need not decide whether that ruling was correct.

At a later juncture in the trial, the trial court denied another motion by Salem for a directed verdict. That ruling came at the conclusion of all the evidence, and after the

---

4. In its brief, Salem uses the name "Unnerstall" to refer to both UCCL and Leonard B. Unnerstall. This is an example of the imprecision that afflicts Salem's brief.

5. Rule references are to Missouri Rules of Civil Procedure (1997).

trial court had awarded UCCL $83,067.36 on its Count II. In studying what Salem's lawyer said at that time, we divine he was seeking a directed verdict in Salem's favor as to only UCCL's Counts I and III.

Inasmuch as UCCL abandoned Count III (as explained earlier in this opinion), it becomes obvious that in resolving Salem's first point, the only denial of a motion for a directed verdict that we need review is the trial court's denial of Salem's motion for a directed verdict in its favor on UCCL's Count I at the close of all the evidence.[6]

Having made our way this far, we continue our effort to extract the theory of error in Salem's first point.

Paragraph "1" of Salem's first point avers "Unnerstall"—we assume Salem is referring to UCCL, not Leonard B. Unnerstall—presented no evidence of Salem's intent "that the representations, if any be relied upon."

The point fails to identify the "representations" toward which the point is directed, and likewise fails to explain wherein or why UCCL's evidence was insufficient to establish that Salem intended that the representations be relied upon. The point is similar to points held insufficient in *Jones v. Jones,* 937 S.W.2d 352, 357–58 (Mo.App. S.D.1996); *Hoppe v. First Midwest Bank of Poplar Bluff,* 899 S.W.2d 879, 882 (Mo.App. S.D. 1995); *Coffey v. State ex rel. County of Stone,* 893 S.W.2d 843, 847 (Mo.App. S.D. 1995); *McClelland v. Williamson,* 627 S.W.2d 94, 98 (Mo.App. S.D.1982). However, inasmuch as UCCL—the only party against whom Salem's first point appears to be directed—lodges no complaint that the point violates Rule 84.04(d), we shall endeavor to divine the import of the point from the argument that follows it, a task we are not required to perform. *McClelland,* 627 S.W.2d at 98[12]; *Haase v. Richmond,* 570 S.W.2d 341, 343–44[1] (Mo.App.1978).

From the argument and the abbreviated statement of facts in Salem's brief, we deduce that the "representations" toward which the point is directed are: (1) the site profile and (2) Felton's statement at the "pre-bid

meeting" on April 2, 1990, that in his opinion, all material to be excavated on the project would be rippable.

As we comprehend UCCL's brief, UCCL shares our understanding of Salem's first point. Salem's reply brief appears to confirm that understanding. Accordingly, we shall proceed on the assumption that the "representations" toward which the first point is directed are the two identified in the preceding paragraph.

Having thus framed the issue, we reach the question of whether there is merit in Salem's contention that UCCL presented no evidence that Salem intended "that the representations . . . be relied upon."

One of UCCL's responses to that contention is that Salem's "intent" is not an element of the cause of action asserted in UCCL's Count I. In support of that position, UCCL cites *Ideker, Inc. v. Missouri State Highway Commission,* 654 S.W.2d 617 (Mo.App. W.D. 1983), a suit by a private contractor against a governmental entity. There, the contractor asserted that the plans prepared by the governmental entity showed the material to be excavated in a construction project would be used to fill low places on the project, thus no expense would be incurred in disposing of the excavated material. *Id.* at 619–20. Contrary to the plans, there were several thousand cubic yards of excavated material that had to be disposed of, causing the contractor unexpected expense. *Id.* at 620.

Affirming a judgment for the contractor, the appellate court held that in such a situation, case law recognizes a "cause of action ex contractu in the nature of breach of warranty." *Id.* The opinion explained:

"[S]ix elements are discerned as necessary to constitute a cause of action ex contractu in the nature of a breach of warranty by a contractor against a governmental entity premised on a positive representation of a material fact:

(1) A positive representation by a governmental entity,

(2) Of a material fact,

(3) Which is false or incorrect,

---

**6.** We glean from Salem's first point and the argument which follows it that the point attacks

no ruling by the trial court regarding DRF&A's claims.

(4) Lack of knowledge by a contractor that the positive representation of the material fact is false or incorrect,

(5) Reliance by a contractor on the positive representation of a material fact made by the governmental entity, and

(6) Damages sustained by a contractor as a direct result of the positive representation of a material fact made by the governmental entity."

*Id.* at 621[1].

Intent by the governmental entity that the contractor rely on the "positive representation" is not one of the six elements of a "cause of action ex contractu in the nature of breach of warranty" listed in *Ideker*. For convenience, we henceforth refer to such a cause of action as an "*Ideker* claim."

The rationale for permitting a contractor to recover against a governmental entity upon proof of only the six elements in *Ideker* is set forth there, 654 S.W.2d at 621[2], and need not be repeated here. However, a hint as to why the contractor need not prove the governmental entity intended that the contractor rely on the representation is found in *Ideker's* explanation that because the contractor is working under a contract with a governmental entity, the doctrine of sovereign immunity historically precluded a cause action ex delicto, i.e., based on fraudulent misrepresentation. *Id.* at 621.

Intent by the speaker that the misrepresentation be acted upon is, of course, an element of a cause of action for fraud. *Heberer v. Shell Oil Co.*, 744 S.W.2d 441, 443[1] (Mo. banc 1988). Inasmuch as an *Ideker* claim is not based on tort, but instead on contract and warranty, the philosophical underpinning of an *Ideker* claim appears to be that the contractor's right to recover should not hinge on whether the governmental entity intended that the representation be relied upon, but only on whether the contractor lacked knowledge that the representation was false and relied upon it to his detriment.[7]

The proposition that scienter on the part of the governmental entity is not an element of an *Ideker* claim is confirmed by *Ideker's* holding that the verdict directing instruction there was not defective in failing to require a finding that the governmental entity knew the representation relied upon by the contractor was false or incorrect. *Id.* at 624[8]. The opinion explained:

" 'The elements of scienter and intent which . . . are essential to constitute fraud, need not be present in the case of warranty.' This court concludes that scienter on the part of the [governmental entity] that its positive representation that [there would be no excess of excavated material to be disposed of] was false or incorrect was not a requisite element of [the contractor's] cause of action."

*Id.* at 624 (citation omitted).

An *Ideker* claim was the basis for recovery by a contractor against a municipality in *Sanders Co. Plumbing and Heating, Inc. v. City of Independence*, 694 S.W.2d 841 (Mo. App. W.D.1985). There, as here, the municipality hired engineers to prepare plans and specifications for a construction project—a sewer. *Id.* at 843. There, as here, the plans and specifications prepared by the engineers included a drawing purporting to show the subsurface conditions. *Id.* There, as here, the conditions turned out to be different than shown, resulting in additional expense to the contractor. *Id.* at 843–44.

On the issue of whether the subsurface conditions shown on the drawing constituted a "positive representation," *Sanders* held:

"What is and what is not a 'positive representation' will always be a question to be answered by the trier of fact case-by-case. But, if those in charge of a public project wish to eliminate that question from any disputes with their contractors, they may do so in advance, first, by making very sure that any representations they make are accurate and, second, by *not making any* representations as to soil conditions and the like and by truly putting the entire burden upon the contractors to do their own pre-bidding investigations. As the ev-

---

7. A brief discussion of the unimportance of the warrantor's intent in a claim for breach of warranty appears in *Turner v. Central Hardware Co.*, 353 Mo. 1182, 186 S.W.2d 603, 608[14] (1945).

idence in this case shows, however, that approach is not without its own special costs in the time needed to conduct such inquiries and the expense of independent investigations that will certainly be reflected in the bids made on the project."

*Id.* at 847.

The elements of an *Ideker* claim were listed, unchanged, in *Massman Const. Co. v. Missouri Highway and Transportation Commission*, 835 S.W.2d 465 (Mo.App.W.D. 1992), a suit by a contractor against a governmental entity. There, the trial court entered summary judgment for the contractor on the issue of liability and submitted only the issue of damages to the jury. *Id.* at 466–67. Reversing a judgment for the contractor, the appellate court held the trial court erred in granting summary judgment on the liability issue in that there was a question of material fact, i.e., whether the contractor was unaware that the representation in issue was false or incorrect. *Id.* at 468–69. The case was remanded for retrial. *Id.* at 469.

The elements of an *Ideker* claim were again listed, unchanged, in *St. Louis Air Cargo Services, Inc. v. City of St. Louis,* 929 S.W.2d 821, 826[2] (Mo.App. E.D.1996), which declares that a positive or affirmative representation distinguishes an actionable representation from one which is merely implied or suggestive. *Id.* at [3]. The representation is material if a reasonable person would attach importance to it in determining his choice of action in the transaction in question. *Id.* at [5].

The primary case relied on by Salem in support of its argument that UCCL was required to prove Salem intended that UCCL rely on the two representations identified earlier in this opinion [8] is *Murphy v. City of Springfield,* 738 S.W.2d 521 (Mo.App. S.D.1987). That case, like the instant case, involved a claim for additional work necessitated because subsurface conditions encountered during the project differed from the conditions shown on specifications prepared by the municipality. *Id.* at 523–24. However, *Murphy* differs from the instant case in that the plaintiff in *Murphy* was a subcon-

tractor and thus had no contract with the municipality. *Id.* at 523.

Attempting to identify the nature of the plaintiff's claim in *Murphy,* this Court said:

"Plaintiff's claim is not 'under any agreement or contract', although it is incidentally related to the contract [between the prime contractor and the municipality].... Plaintiff's claim is based upon misrepresentation by which it was induced to bid and enter into a contract with [the prime contractor] for a lower amount than it would have agreed to. Such a claim is fundamentally tort in character....

As this claim 'sounds in tort', contract principles do not govern."

*Id.* at 525–26[2] and [3] (citations omitted).

Salem seizes upon a later segment of *Murphy* which states that the jury should decide whether the municipality intended that bidders rely on the information about subsurface conditions shown on the specifications. *Id.* at 528. On that subject, the opinion said:

"*Ideker* and *Sanders* do not include [intent] as an element, but in those cases that did not appear to be an issue. Here it was. Whether the ... information was intended to be used only for determining the length of the caisson shafts or the [municipality] was aware and intended that a general or subcontractor would use it to determine cubic quantities is a question for the trier of fact."

*Id.* Based on that excerpt, Salem maintains the controlling law in the Southern District is that a contractor must prove the municipality intended that the contractor rely on the representations, irrespective of whether the contractor is a prime contractor or subcontractor.

We hold *Murphy* does not control the instant case because, as observed earlier: (1) *Murphy* was a suit between a subcontractor and a municipality, hence the subcontractor had no contract with the municipality, and (2) the cause of action in *Murphy* was "tort in character," based upon misrepresentation, not an *Ideker* claim based on contract and warranty. As previously explained, in a tort action based on misrepresentation, one ele-

---

8. The site profile and Felton's statement at the   April 2, 1990, meeting.

ment is intent by the speaker that the misrepresentation be relied upon. That element is not required in an *Ideker* claim.

Our conclusion that *Murphy* does not apply where a contractor brings an *Ideker* claim was embraced in *St. Louis Air Cargo*, 929 S.W.2d at 827, where the court said: "In *Murphy*, no written contract existed between the parties, and the Court concluded that the action was basically a tort action for misrepresentation."

■ We hold UCCL's Count I was an *Ideker* claim; consequently, the theory of error in paragraph "1" of Salem's first point—the contention that UCCL failed to make a submissible case on its Count I in that UCCL· "presented no evidence of Salem's intent that the representations, if any be relied upon"—is without merit.[9]

Paragraph "2" of Salem's first point avers UCCL failed to make a submissible case on its Count I in that the "alleged statements that [UCCL] relies on constitute statements of opinion, not positive representations."

Instruction 11 was the verdict-directing instruction on UCCL's Count I.[10] The representation hypothesized by paragraph "First" of Instruction 11 was that Salem "positively represented to [UCCL] that the subsurface material to be excavated on the site of the construction project was rippable."

Earlier in this opinion, we noted that the evidence on which UCCL relied to prove the representation was: (1) the site profile and (2) Felton's statement at the "pre-bid meeting" on April 2, 1990, that in his opinion, all material to be excavated on the project would be rippable.

In support of its thesis that the representations identified in the preceding paragraph do not constitute "positive representations" sufficient to support an *Ideker* claim, Salem cites the following segment of *Ideker*:

"[A] *bright* line is drawn between 'positive' or 'affirmative' representations and representations of a lesser degree which are merely implied or suggestive. A 'positive' or 'affirmative' representation distinguishes an actionable representation from one which is merely implied or suggestive. Ergo, a 'positive' representation of a material fact is· a necessary element of such a cause of action. The tightly drawn distinction between 'positive representations' and 'representations' is more than an exercise in semantics or the exaltation of form over substance. The requirement that the representation be 'positive' or 'affirmative' goes to the very heart of whether a submissible case is made by reason of 'boiler plate' provisions invariably found in this and similar cases ostensibly disclaiming a contractor's reliance on the representation. A distinction implicitly weaves throughout representative cases from other jurisdictions that a contractor's reliance on representations, neither positive nor affirmative,

9. We note that Judge Somerville, the author of *Ideker*, dissented in *Sanders*, expressing concern that the theory of recovery identified in *Ideker* was never intended to be a panacea for every successful bidder whose costs overrun the bid price. 694 S.W.2d at 850. He pointed out the difficulty in reconciling *Ideker* with the well-established principle of contract law that when one agrees to do a thing possible of performance, he will not be excused or become entitled to additional compensation because unforeseen difficulties are encountered. *Id.* at 850–51. However, we have concluded it is not for us to question whether *Ideker* is sound law. In obedience to the rule of *stare decisis*—the doctrine that, when a point of law has been settled by decision, it forms precedent which is not afterwards to be departed from unless considerations of public policy demand it (Black's Law Dictionary 1577–78 (4th ed.1951))—we conclude that if *Ideker* and its progeny are to be abridged or abrogated, the task is for the Supreme Court of Missouri, not us.

10. Instruction 11 read:

" ... on Plaintiff's claim for damages for breach of warranty by·Defendant, your verdict must be for Plaintiff if you believe:

First, Defendant positively represented to Plaintiff that the subsurface material to be excavated on the site of the construction project was rippable, and

Second, the representation was false or incorrect, and

Third, the representation was material to the bid made by Plaintiff for the construction project, and

Fourth, Plaintiff did not know that the representation was false or incorrect, and

Fifth, Plaintiff relied on the representation in making its bid for the construction project, and

Sixth, as a direct result of such representation, Plaintiff was damaged."

but implied or suggestive only, may be disclaimed by comparable 'boiler plate' provisions."

654 S.W.2d at 624 n. 3.

In *Ideker*, as reported earlier, the representation was that the project would be a "balanced job," i.e., the material to be excavated would be used to fill low places on the project, thus no expense would be incurred in disposing of the excavated material. *Id.* at 619–20, 622. The appellate court in *Ideker* found the representation sufficient to support the claim. The court also held that certain "boiler plate" provisions in the contract stating that the contractor was fully informed about all conditions affecting the work by reason of its own investigation did not bar the contractor from relying on the representation that the project was a "balanced job." *Id.* at 622–23[3].

Here, Salem asserts: "[R]ippability does not even rise to the level of a representation of fact, let alone a positive representation." According to Salem, "rippability" is merely a matter of opinion.

In response to Salem's argument, UCCL reminds us that in cases such as this, what is and what is not a "positive representation" will always be a question to be answered by the trier of fact. *Sanders*, 694 S.W.2d at 847. Additionally, UCCL emphasizes that an appellate court will overturn a verdict only when there is a complete absence of probative facts to support it. *Elliott v. Wescoat*, 336 S.W.2d 649, 652[6] (Mo.1960). UCCL insists that the evidence, viewed favorably to it, is sufficient to support a finding that Salem made a positive representation that all subsurface material to be excavated was rippable, and that this was a representation of a material fact.

We first consider whether the site profile (described at length earlier in this opinion) constituted a positive representation of a material fact.

Unnerstall testified it is "common" in the construction industry that anything above a roller bit refusal line is rippable, hence he relied on the roller bit refusal line on the site profile in determining UCCL would encounter no "nonrippable rock" on the project.

Donald S. Eskridge, a "consulting civil engineer" specializing in "solid mechanics and hydrology," testified the roller bit refusal line on the site profile showed "the top of nonrippable rock material," that is, everything above the roller bit refusal line and below the auger refusal line would be rippable, and everything above the auger refusal line would be "common excavation." Therefore, according to Eskridge, the site profile showed all of the material to be excavated on the project would be rippable.

Felton, the president of DRF&A, the engineering firm that prepared the site profile, was asked about it:

"Q. ... Mr. Felton, I believe your testimony is that this drawing does not show the excavation of any nonrippable rock material, is that correct?

A. Right.

Q. It shows the excavation above this line of rippable material, is that correct?

A. Yes."

Although the word "rippable" does not appear on the site profile, Missouri courts have held that drawings incorporated into a construction contract can constitute an actionable representation. *St. Louis Air Cargo*, 929 S.W.2d at 826; *Bernard McMenamy Contractors, Inc. v. Missouri State Highway Commission*, 582 S.W.2d 305, 310–13 (Mo. App. W.D.1979). On that subject, *Ideker* said:

"The undisputed evidence in the instant case pointed in one direction—the plans in question positively represented the project to be a 'balanced job' with like efficacy as if literally spelled out word for word.... *McMenamy* teaches that the use of conventional syntax is not the only means of making a positive representation."

654 S.W.2d at 622.

Viewing the site profile and the testimony explaining its significance in the construction industry favorably to the verdict on UCCL's Count I, we hold the jury could have reasonably found such evidence constituted a positive representation that the subsurface material to be excavated on the site was rippable. As to the materiality of the repre-

sentation, there was uncontradicted evidence that Unnerstall relied on the representation in calculating UCCL's bid, basing the bid on the premise that there was no non-rippable rock to be excavated.

We hold the above evidence sufficient to make a submissible case on the element of positive representation of a material fact in an *Ideker* claim. Having decided that, we need not decide whether Felton's statement at the "pre-bid meeting" on April 2, 1990, constituted such a representation.

Finding no merit in the assignment of error in paragraph "2" of Salem's first point, we turn to Salem's second point. There, Salem charges the trial court with error in giving Instruction 11.[11] Salem maintains the instruction was erroneous because it "failed to instruct the jury that [UCCL] was required to prove that Salem intended that the representations, if any, be relied on."

In rejecting paragraph "1" of Salem's first point, we held that in an *Ideker* claim, the contractor need not prove that the governmental entity intended that the contractor rely on the positive representation. Accordingly, we deny Salem's second point.

Salem's third point reads:

"The trial court erred in instructing jurors that they could award interest and in denying Salem's motions for judgment notwithstanding the verdict or for new trial against Unnerstall and Felton, because the claims herein sound in tort or constituted unliquidated claims that were not proper subjects for pre-judgment interest."

Although the point ostensibly predicates error in the giving of a jury instruction (or instructions), neither the point nor the argument following it identifies the allegedly erroneous instruction (or instructions). Furthermore, no instruction is set forth in the argument portion of Salem's brief. If a point relates to the giving of an instruction, Rule 84.04(e) requires that such instruction be set forth in full in the argument portion of the brief.

After UCCL's brief pointed out the above flaws, Salem asserted in its reply brief that

its third point "does not directly relate to the giving of an instruction." Instead, said Salem, "[T]his point challenges the trial court's submission of interest to the jury, and the trial court's failure to enter judgment notwithstanding the jury's award of interest."

Another enigma in the point is its reference to Salem's "motions for judgment notwithstanding the verdict or for new trial." The plural noun "motions" indicates Salem is referring to more than one post-judgment motion. However, our search of the record reveals only one post-judgment motion filed by Salem.

Additionally, the point avers "the claims herein sound in tort or constituted unliquidated claims." Of the three claims on which judgment was entered against Salem, only one—UCCL's Count I—was arguably a claim that would "sound in tort," and we have already held it was an *Ideker* claim, not a tort claim. Consequently, the averment that the "claims" sound in tort is meritless.

Finally, the allegation that the "claims" constituted "unliquidated claims" supplies no hint as to wherein or why that is so. Consequently, the point violates Rule 84.04(d) and *Thummel*, 570 S.W.2d at 684–88.

Because of the above defects, we hold Salem's third point presents nothing for review. Nonetheless, as there may always be a possibility that plain error relief is warranted under Rule 84.13(c), we have seined the argument following the point in an effort to learn why the "claims" were "unliquidated."

In the argument, we discover that the "unliquidated" claims to which Salem refers are UCCL's Count II and DRF&A's claim. The argument characterizes those claims as unliquidated "because there is a dispute among the parties whether the money was due and owing until the federal government had paid its 90 percent share of the costs." Contrary to Rule 84.04(h), Salem cites no page reference to the legal file or transcript in support of that proclamation. Salem directs us to nothing in the record indicating that receipt of funds from the "federal government" was a condition precedent to Sa-

---

**11.** Footnote 10, *supra.*

lem's duty to pay UCCL or DRF&A, and Salem cites no authority for that proposition. We therefore find no manifest injustice or miscarriage of justice calling for plain error relief.

Salem's final point, as we construe it from the argument that accompanies it, maintains the trial court erred in receiving evidence of Felton's statement at the "pre-bid meeting" on April 2, 1990.

■ Whatever merit, if any, that might inhere in that complaint need not be considered because, as UCCL points out, the issue was not raised in Salem's motion for new trial.

Rule 78.07 provides, subject to certain exceptions, none of which applies to Salem's fourth point, that allegations of error in jury-tried cases, to be preserved for appellate review, must be included in a motion for a new trial. Salem does not claim the issue in its fourth point was raised in its motion for new trial. Consequently, the fourth point is ineligible for review. *State ex rel. McNutt v. Northup*, 367 S.W.2d 512, 514[7] (Mo.1963).

Judgment affirmed.

GARRISON, P.J., and PREWITT, J., concur.